In the Matter of the WELFARE OF George Stewart DAHL.

No. 49327.

Supreme Court of Minnesota.

March 30, 1979.

---

Paul A. Kief, Dist. Public Defender, Bemidji, for appellant.

Douglas W. Cann, County Atty., and James W. Haskell, Asst. County Atty., Bemidji, for respondent.

Heard before PETERSON, YETKA, and SCOTT, JJ., and considered and decided by the court en banc.

SCOTT, Justice.

This is an appeal from an order of a three-judge panel of the Ninth Judicial District affirming the Beltrami County Court's referral of a juvenile to district court for adult prosecution. Appellant sought, and was granted, permission to appeal to this court from the district court's order.[1] We vacate the reference order and remand the case for further proceedings.

On April 8, 1978, the dead body of Ricky Alan McGuire, who had been missing since November 17, 1977, was found in a remote area of Beltrami County. A witness described the frontal section of his head as "just disappeared, gone." A cap found near the body had a hole in it about the size of a half dollar. Three expended shotgun cartridges were also found lying near the body. In a petition filed on April 10, 1978, in Beltrami County Court, appellant was charged with delinquency for the first-degree murder of Ricky Alan McGuire. The petition alleged that appellant admitted that he shot McGuire on November 17, 1977, and planned to return to the scene in the spring to conceal the body; that witnesses are fearful of their safety and lives if appellant is freed during the pendency of the proceedings; that appellant was using a considerable amount of marijuana; and that appellant had recently authored a note stating that certain local persons must be "terminated." In addition, the petition requested that the court enter an order referring appellant for prosecution as an adult pursuant to Minn.St. 260.125.

Appellant was born on March 2, 1960, and therefore was 17 years old at the time of the alleged offense and 18 years old at the time the delinquency petition was filed. His parents described him as a respectful, obedient, and trustworthy child. Appellant stated that he had good relationships with his parents and younger brothers, and denied that he had any emotional problems.

At the time of the alleged wrongful conduct, appellant was a senior in high school, maintaining about a B average. He plans to attend Bemidji State University upon his graduation from high school. He participated in interscholastic track and crosscountry running and in intramural basketball. He once received a two day in-school suspension for swearing and kicking his locker. This conduct apparently occurred upon appellant's discovery that his expensive watch had been stolen. Appellant was employed since the fall of 1976 by a local restaurant. Prior to that time he worked as a stock boy and carryout boy at a local grocery store and as a trap setter at a local gun club. He was a steady and industrious worker.

Appellant's only prior contact with the juvenile court involved a charge of reckless driving which was eventually dismissed at the completion of a 45-day suspension of his driver's license. Accordingly, the county court observed that:

" * * * it is clearly apparent that the juvenile is not the typical delinquent

---

1. An appeal from a district court's review of a county court decision may be taken "with leave of the supreme court." Minn.St. 487.39, subd. 2.

seen by the Juvenile Court. This offense [first degree murder], if he is guilty of it, appears to be an isolated delinquent act rather than an outcropping pattern of behavior normally associated with the classification of juvenile delinquent."

The reference hearing was held on April 18, 1978, before the county court, with notice of the hearing being given on April 11, 1978. A reference study by the county probation officer at the order of the court was completed on April 14, 1978, and recommended that appellant be referred for prosecution as an adult because of the lack of treatment programs for the serious juvenile offender who has reached the age of 18, and because the public safety is not served by the security measures taken at juvenile treatment centers. No psychological or psychiatric information concerning appellant was obtained.

On April 26, 1978, the court rendered its decision, referring appellant for prosecution as an adult on both nonamenability to treatment and public safety grounds. In its memorandum, the court also denied appellant's motion to investigate other treatment possibilities because it did not feel that "there was a realistic likelihood that such an institution could be found * * *." On May 25, 1978, appellant appealed the juvenile court's decision to the district court. Appellant petitioned the county court, on July 7, 1978, for a rehearing on the basis of newly-discovered evidence. Attached to the petition was information pertaining to treatment programs outside the state of Minnesota. On August 1, 1978, a three-judge panel of the Ninth Judicial District Court affirmed the decision of the county court. The county court, on August 10, 1978, denied appellant's petition for a rehearing on the grounds that the court no longer had jurisdiction over the matter and that further investigation of treatment facilities would be fruitless because appellant could not be successfully treated within the time he would be subject to juvenile court supervision and control.

The question before us is whether the county court, acting in its capacity as the juvenile court, has met the required standards in ordering this juvenile referred to the adult authorities for prosecution. Pursuant to Minn.St. 260.125, the juvenile court may waive its jurisdiction and refer the juvenile for prosecution as an adult. Subdivision 2 of that section provides:

"The juvenile court may order a reference only if

\* \* \* \* \* \*

"(d) The court finds that the child is not suitable to treatment or that the public safety is not served under the provisions of laws relating to juvenile courts."

Since subdivision 2(d) is phrased in the alternative, a finding of either nonamenability to treatment or harm to public safety is sufficient to refer a juvenile for prosecution as an adult. *State v. Duncan*, Minn., 250 N.W.2d 189 (1977); *State v. Hogan*, 297 Minn. 430, 212 N.W.2d 664 (1973). In the instant case, the juvenile court found that both criteria set out in Minn.St. 260.125, subd. 2(d), were satisfied, and thus referred appellant for prosecution as an adult.

The decision to refer a juvenile for prosecution as an adult, of course, is of tremendous consequence to both the involved juvenile and society in general. Unfortunately, the standards for referral adopted by present legislation are not very effective in making this important determination. A recent law review article, Feld, Reference of Juvenile Offenders for Adult Prosecution: The Legislative Alternative to Asking Unanswerable Questions, 62 Minn.L.Rev. 515 (1978), addressed this very problem:

" * * * Like the quest to determine who may be amenable to treatment, efforts to identify the currently or potentially dangerous have entailed social science research as well as judicial inquiry. The irresistible conclusion of this research is that identification of the dangerous 'presupposes a capacity to predict future criminal behavior quite beyond our present technical ability.'

"In this regard, one of the leading scholars on the prediction of dangerousness concludes that '[t]he ability to predict which juvenile will engage in violent

crime, either as adolescents or as adults, is very poor.

" 'The conclusion of Wenk and his colleagues that "there has been no successful attempt to identify, within * * * offender groups, a subclass whose members have a greater than even chance of engaging again in an assaultive act" is as true for juveniles as it is for adults. It holds regardless of how well trained the person making the prediction is—or how well programmed the computer—and how much information on the individual is provided. More money or more resources will not help. Our crystal balls are simply very murky, and no one knows how they can be polished.' " 62 Minn.L. Rev. 541.

Due to these difficulties in making the waiver decision, many juvenile court judges have tended to be overcautious, resulting in the referral of delinquent children for criminal prosecution on the erroneous, albeit good faith, belief that the juveniles pose a danger to the public. Accordingly, a re-evaluation of the existing certification process may be in order. As Professor Feld states:

"The problem of predicting dangerousness is not merely that it cannot be done with an acceptable degree of accuracy but also that there is a very substantial tendency to overpredict and to identify as potentially dangerous persons who, if subsequently released, would engage in no further violent or even criminal behavior. Thus, '[t]he conclusion to emerge most strikingly from these studies is the great degree to which violence is over-predicted * * *. Of those predicted to be dangerous, between 65 percent and 99 percent are *false positives*—that is, people who will not, in fact, commit a dangerous act * * *. Violence is vastly overpredicted whether simple behavioral indicators are used or sophisticated multivariate analyses are employed and whether psychological tests are ad-

ministered or thorough psychiatric examinations are performed.'

"The tendency to overpredict dangerousness raises profound moral questions with which society must deal in its treatment of both juvenile and adult offenders. In the context of assessing dangerousness for purposes of parole release, for example, how many false positives—people who would not offend again if released—are we willing to continue to incarcerate in order to ensure that those relatively few but unidentifiable individuals who actually would offend are not released? To what extent are we willing to permit judicial speculation about future violence in the waiver context if to do so means that large numbers of juvenile 'false positives' may be prosecuted as adults?" 62 Minn.L.Rev. 542. (Italics supplied.)

The statutory mandate contained in Minn.St. 260.125 must nevertheless be adhered to. After all, the juvenile court is a statutory court that could be abolished tomorrow if the legislature so decided and thus, until changed, the statutory scheme for reference must be followed.

■ In this case, appellant was referred for prosecution as an adult primarily because the juvenile court determined that appellant could not be successfully treated within the period of time remaining before the juvenile court's jurisdiction of this matter is terminated.[2] This is a proper basis for concluding that a juvenile is unsuitable to treatment, see, *H. v. Superior Court of Los Angeles County*, 3 Cal.3d 709, 91 Cal. Rptr. 600, 478 P.2d 32 (1970); *P. H. v. State*, 504 P.2d 837 (Alaska 1972); however, the court's finding is not reasonably supported by the evidence. Although requested by the juvenile, no mental testing of appellant was performed, and consequently the record is devoid of any psychological or psychiatric data which could conceivably support the juvenile court's observation. Nor does the

**2.** Minn.St. 260.181, subd. 4, states that the juvenile court's jurisdiction continues until the child reaches the age of 21, unless the court terminates its jurisdiction before that time.

Thus, at the time of the court's decision, appellant could have been under the jurisdiction of the juvenile court for a little less than three years.

evidence disclose any negative information regarding the juvenile's background prior to the present act. On the contrary, the record shows that appellant has an exemplary background and is not the typical chronic offender who is usually subject to reference. In making its decision the juvenile court relied on the serious nature of the offense involved, appellant's age, "social adjustment," and maturity level. These considerations, in the absence of supporting psychological data or a history of misconduct, are insufficient to support the court's finding that appellant could not be successfully treated within the remaining three years the juvenile could be under the control of the juvenile court system.[3]

Unquestionably, extremely experienced jurists are involved in this case. The juvenile court judge with over 20 years of experience on the bench is steeped in the philosophy and knowledge of the juvenile statutes, as are the district court judges on review. Additionally, the juvenile court was careful procedurally as well as thorough in its findings and explanatory memorandum, satisfying all required due process and equal protection standards.[4] The courts, in making their decisions, may very well have been using equitable reasoning and common sense based upon complete and sound logic in viewing a factual situation where an individual shot another three times, killing him; where upon speculation an adult jury would probably convict; and where in the eyes of the public, if he is convicted, a sentence for more than 3 years should be served. This attitude seems to be reflected by the record. But no matter how pragmatic such reasoning may be, it is a mistaken interpretation of the statutory intent of the legislature.

■ The legislature did not single out certain crimes for reference to adult prosecution, although it had that specific opportunity.[5] The law does not say that all petitions filed in juvenile court alleging first degree murder are automatically subject to certification, nor does the statute provide that 17-year-old violators are automatically referred for adult prosecution. It is clear from the findings of the Supreme Court Juvenile Justice Study Commission, November 1976, that although a juvenile's age may be a pertinent consideration it should not be a substantial factor in determining whether certification is appropriate. The report states:

"Results of the Commission study indicate that a juvenile's proximity to his 18th birthday often was a consideration in making a decision to refer him for adult prosecution. Reasons for this consideration were generally (a) that the youth nearing 18 has a 'right' to be treated as an adult and (b) a widespread impression that the Department of Corrections 'automatically' releases juveniles committed to its care at age 18, providing insufficient time to effectively treat or rehabilitate a child committed shortly before his 18th birthday. While considerations of a child's 'maturity' may be appropriate for the juvenile court to weigh in making a reference decision, the mere fact of a juvenile's chronological age, i. e., his nearness to 18, should not be the primary determinant of certification. * * *" Id., p. 23.

It appears in this case that reference was made because of age and seriousness of the crime, neither of which meets the statutory requirements.

■ The state argues that the juvenile court's determination, relative to public

---

**3.** Nor do the assertions made by the state in its petition provide support for the court's decision. They are merely allegations of fact, and thus we do not know whether they are actually true. Only the offense in question is presumed to be true for purposes of the reference hearing. See, *In re Welfare of W. J. R.*, 264 N.W.2d 391 (Minn.1978).

**4.** See, *In re Welfare of I. Q. S.*, 309 Minn. 78, 244 N.W.2d 30 (1976), noted in 4 Wm. Mitchell L.Rev. 461; *In re Welfare of J. E. C. v. State*, 302 Minn. 387, 225 N.W.2d 245 (1975); *In re Gault*, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967); *Kent v. United States*, 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966).

**5.** See, H. F. No. 1277, 70th Minn.Legis., 1977 Sess.

safety, is reasonable when the considerations set out in *State v. Hogan,*[6] 297 Minn. 430, 212 N.W.2d 664 (1973), are applied to the facts of this case. Although this contention has some superficial appeal, when we apply all of the relevant evidence there is nothing in the record to show that the public safety will suffer in the future, or has done so in the time between the act and the arrest.[7] No psychological information is contained in the record which might support this finding, nor does the juvenile's exemplary background indicate that he is a threat to the public safety. The record must reflect more reasons portending future danger; otherwise appellant would be referred solely on the basis of the offense in question. As discussed above, the existing statutory framework does not authorize referral based on the specific crime charged. Accordingly, this court did not intend the application of the *Hogan* factors to result in the referral of a juvenile solely because of the alleged offense. Rather, as stated in *Hogan,* the criteria we listed in that decision are only "*among* the relevant factors to be considered." 297 Minn. 438, 212 N.W.2d 669 (emphasis added). The record must contain direct evidence that the juvenile endangers the public safety for the statutory reference standard to be satisfied.

The present petition filed in county court may make one shudder in reflecting upon the alleged event, but the record fails to show that this juvenile is "not suitable" to treatment or that the "public safety" will suffer. We therefore remand to the county court with instructions to examine properly admissible evidence to be submitted at a further hearing for the purpose of determining whether, in light of this opinion, the statutory reference criteria are satisfied. If the record's substance is not materially altered as a result of this additional evidence, reference to adult court is not justified and thus the proceedings should continue in juvenile court.[8]

The reference order is vacated and the matter is remanded for further proceedings consistent with this opinion.

---

6. In *Hogan,* we stated that: "In determining if the public safety would be threatened, among the relevant factors to be considered are: (1) The seriousness of the offense in terms of community protection; (2) the circumstances surrounding the offense; (3) whether the offense was committed in an aggressive, violent, premeditated, or willful manner; (4) whether the offense was directed against persons or property; (5) the reasonably foreseeable consequences of the act; and (6) the absence of adequate protective and security facilities available to the juvenile treatment system. [Citations omitted]." 297 Minn. 438, 212 N.W.2d 669.

7. The state argues that a "type of death note" written by appellant shows that the public safety is endangered. The state is referring to the allegation made in the Delinquency Petition that appellant had "written a note stating that certain local persons must be 'terminated.'" However, there is no evidence in the transcript of the reference hearing which substantiates this allegation. Accordingly, since no evidence is before the court regarding the note, and because this is not the type of charge which is presumed true for purposes of the reference hearing, see n. 3, *supra,* this factual allegation does not provide support for the county court's decision.

8. Should, upon remand, the juvenile court determine that appellant is amenable to treatment, we urge the court to consider whether the newly-created Minnesota Serious Juvenile Offender Program would be an appropriate program for appellant.