In the Matter of the WELFARE
OF J.L.B., Child.

No. C4-88-1251.

Court of Appeals of Minnesota.

Feb. 14, 1989.
Review Denied March 17, 1989.

C. Paul Jones, State Public Defender, Susan K. Maki, Asst. Public Defender, Minneapolis, for appellant.

Alan L. Mitchell, St. Louis Co. Atty., Gordon P. Coldagelli, Asst. Co. Atty., Virginia, for respondent.

Considered and decided by FORSBERG, P.J., and CRIPPEN and NORTON, JJ., without oral argument.

## OPINION

NORTON, Judge.

J.L.B. appeals from an order of the St. Louis County District Court, Juvenile Division, referring him for adult prosecution on charges of second degree murder, or in the alternative aiding a suicide, and murder of an unborn child. The trial court found that the state proved by clear and convincing evidence in the totality of the circumstances that the public safety is not served by retaining J.L.B. in the juvenile system. We affirm.

## FACTS

J.L.B. is charged with one count of second degree murder, an alternative count of aiding a suicide, and murder of an unborn child in connection with the death of his girlfriend, R.C. R.C. was approximately six and one-half months pregnant at the time of her death. J.L.B. was then seventeen years and two months old. J.L.B. turned nineteen on January 28, 1989.

On the night of April 9, 1987, the St. Louis County Sheriff's Office received a telephone call from Father Brian Schultz, a local Catholic priest. Schultz reported a telephone call from an anonymous teenage caller who stated that his girlfriend had shot herself in the woods that afternoon. The caller told Schultz that he hid the body and walked home. Approximately four hours later, the sheriff's office received a call from R.C.'s father, reporting that his 18-year-old daughter was missing. R.C.'s father stated that R.C. had been having problems with her boyfriend, J.L.B., and that J.L.B. had been evasive when R.C.'s father questioned him earlier that evening. R.C.'s father telephoned the sheriff's office again about an hour later and reported that R.C. had told her grandmother that she was pregnant and that J.L.B. was the father of her child.

The sheriff's office obtained a search warrant for J.L.B.'s home, and received permission from J.L.B.'s mother to question him. J.L.B. waived his *Miranda* rights. According to J.L.B., he had spoken by telephone with R.C. after school, and they agreed to meet at their regular place in the woods between their homes. J.L.B. waited an hour, but R.C. did not show up. When the sheriff's officer confronted J.L.B. with the telephone call to Schultz, J.L.B. asked if he could "start all over again." J.L.B. then related his account of R.C.'s death. According to J.L.B., R.C. asked him to meet her and to bring a gun to the meeting. J.L.B. brought a Ruger .44 magnum rifle and ammunition with him. J.L.B. and R.C. talked together, and R.C. said they should shoot themselves. J.L.B., who did not want to commit suicide, loaded the gun and R.C. placed it in her mouth. They continued talking for approximately fifteen minutes. R.C. asked J.L.B. to "help her" by counting to three. J.L.B. counted to three, and when R.C. did not do anything, he turned and began walking away. J.L.B. heard a "noise" and realized R.C. had shot herself. He became frightened and dragged her body into a wooded area where he hid it. J.L.B. returned home through the woods. When he got home, J.L.B. changed clothes and washed his hands and arms. He pried a jammed shell out of the gun and threw away two live rounds in the woods behind his home. J.L.B. then cleaned the gun with WD-40.

J.L.B. stated that he and R.C. had discussed R.C.'s pregnancy while at the meeting place. J.L.B. maintained that he was not the father of her child and had never had intercourse with her. J.L.B. led sheriff's deputies to the meeting place in the woods where they located R.C.'s body.

Tests performed during the ensuing investigation revealed that R.C. was killed by a large caliber gunshot wound; that the gun had been in her mouth or in close proximity to her mouth at the time it was fired; that she was approximately six to six and one-half months pregnant; that the fetus died as a result of asphyxiation secondary to maternal death; that the likelihood of J.L.B.'s paternity was 99.132; and

appellant was a possible source of semen found in a vaginal swab taken from R.C.'s body and on the panties which she had been wearing at the time of her death. The sheriff's office conducted an extensive investigation, including numerous interviews.

On April 1, 1988, a delinquency petition and motion for reference to adult court were filed. A reference hearing was held on May 17–18, 1988, following a court ordered reference study and psychological examination. Several people testified at the hearing, including Jean Specht, the probation officer who conducted the reference study; Dr. Olmsted, the psychologist who performed the court ordered examination; Mr. McAllister, a psychologist, and Dr. Roberts, a psychiatrist, both of whom counseled J.L.B.; and several friends or relatives of R.C. and J.L.B.

Both McAllister and Roberts diagnosed J.L.B. as having a schizoid personality disorder. Olmsted stated that his observations could be consistent with this diagnosis. McAllister characterized schizoid personality disorder as a pervasive pattern of indifference to social relationships including a sense of detachment and alienation and a sense of passivity. J.L.B.'s experts stated that although outpatient psychotherapy could help J.L.B., he does not have a mental illness, and that many people with schizoid personality disorder do not seek treatment because they are able to function in a limited capacity. Roberts opined that J.L.B. is not a danger to society, and that if J.L.B. received weekly treatment for twelve months, he would be much more "socially adaptive." McAllister could not predict how long it would take to effectively treat J.L.B. Olmsted stated that treatment for this disorder is usually long-term, and in his opinion it was doubtful that someone could be satisfactorily treated in a one-year period.

There was also testimony that R.C. told a friend and the school guidance counselor that she was afraid J.L.B. might hurt her, and that she was concerned for the welfare of her baby.

The trial court granted the motion for reference, finding that the public safety is not served by retaining J.L.B. in the juvenile system.

## ISSUE

Did the trial court err in granting the state's motion for reference to adult court?

## ANALYSIS

■ A juvenile court has considerable latitude in determining if certification for adult prosecution will be made. Its decision will not be upset unless its findings are clearly erroneous so as to constitute an abuse of discretion. *In re Welfare of I.Q.S.*, 309 Minn. 78, 86–87, 244 N.W.2d 30, 38 (1976).

■ In order to refer a child for adult prosecution, the trial court must find (1) probable cause to believe the child committed the offenses alleged in the delinquency petition and (2) a demonstration by clear and convincing evidence that the child is not suitable to treatment or that the public safety is not served under the provisions of law relating to juvenile courts. Minn.Stat. § 260.125, subd. 2 (1988); *Matter of Welfare of D.F.B.*, 433 N.W.2d 79, 81 (Minn. 1988). For purposes of the reference hearing, the charges against the juvenile are presumed to be true. *In re Welfare of W.J.R.*, 264 N.W.2d 391, 393 (Minn.1978).

A prima facie case that the public safety is not served or that the child is not suitable for treatment is established if the child was at least sixteen years old at the time of the alleged offense, and:

(1) Is alleged by delinquency petition to have committed an aggravated felony against the person and (a) in committing the offense, the child acted with particular cruelty or disregard for the life or safety of another; * * *

Minn.Stat. § 260.125, subd. 3 (1988).

We agree with the trial court that a prima facie case was established. J.L.B. is alleged to have committed second degree murder; he was over sixteen years old at the time; and allegations in the petition indicate that the offenses were committed with particular cruelty and disregard for the life of R.C. and her unborn child.

■ A prima facie case may be rebutted by significant evidence that the juvenile is suitable for treatment or that public safety is served under the provisions of laws relative to juvenile courts. There is no necessity to prove both these elements. *Matter of Welfare of T.R.C.*, 398 N.W.2d 662, 665 (Minn.Ct.App.1987) (citing *Matter of Welfare of Haaland*, 346 N.W.2d 190, 193 (Minn.Ct.App.1984)). "Significant evidence" is the same as substantial evidence, and the quantum of evidence required to rebut a prima facie case in a reference hearing is the same as in other civil matters. *D.F.B.*, 433 N.W.2d at 81.

■ The trial court determined that J.L. B. presented significant evidence to rebut the prima facie case. We agree. Expert witnesses testified that J.L.B. has a schizoid personality disorder; that he is immature, not at all violent, and does not pose a threat to others; and that he is suitable for treatment. This testimony is sufficient to rebut the presumption in favor of reference. *See D.F.B.*, 433 N.W.2d at 81.

■ If the prima facie case is rebutted, the court considers the totality of the circumstances, which includes, but is not limited to, the factors listed in subdivision 2 of Minn.R.Juv.Cts. 32.05. These factors are:

(a) the seriousness of the offense in terms of community protection,

(b) the circumstances surrounding the offense,

(c) whether the offense was committed in an aggressive, violent, premeditated or willful manner,

(d) whether the offense was directed against persons or property, the greater weight being given to an offense against persons, especially if personal injury resulted,

(e) the reasonably foreseeable consequences of the act,

(f) the absence of adequate protective and security facilities available to the juvenile treatment system,

(g) the sophistication and maturity of the child as determined by consideration of

the child's home, environmental situation, emotional attitude and pattern of living,

(h) the record and previous history of the child,

(i) whether the child acted with particular cruelty or disregard for the life or safety of another,

(j) whether the offense involved a high degree of sophistication or planning by the child, and

(k) whether there is sufficient time available before the child reaches age nineteen (19) to provide appropriate treatment and control.

Minn.R.Juv.Cts. 32.05, subd. 2(a–k).

 In determining if the statutory test for reference has been met, the court must consider all of the relevant circumstances and not just age or seriousness of the offense. *See D.F.B.* 433 N.W.2d at 81–82. Because evidence of the offense alone is not sufficient to justify reference, it is necessary to examine non-offense related factors. We recognize the continued validity of the multifactor analysis enunciated in *Matter of Welfare of Dahl*, 278 N.W.2d 316 (Minn.1979). We note, however, that the supreme court justified reference in D.F.B.

"bearing in mind the legislature's revised statement of purpose and looking at all the factors listed in R. 32.05, including the offense with which D.F.B. is charged, the manner in which he committed the offense, the interests of society in the outcome of this case, the [expert] testimony * * *."

*D.F.B.*, 433 N.W.2d at 81–82. We believe *Dahl* has been modified in accordance with the above statement.

The trial court determined that reference is justified based on several of the Rule 32 factors. Although the court did not specifically apply each factor, the court's findings and memorandum indicate that the court did not base its decision solely on factors related to the alleged offenses. Applying the Rule 32 factors, we believe that the trial court's decision to refer J.L.B. for adult prosecution is correct. The charged offenses are acts which caused personal injury, resulting in death; death was a foreseeable consequence of the acts; and the acts were committed with particular cruelty and disregard for the lives and safety of R.C. and her child. Additionally, the author of the court-ordered reference study reported an absence of available programs in the juvenile system, other than commitment to the Commissioner of Corrections until J.L.B.'s nineteenth birthday.

 The trial court based its decision to refer J.L.B. on its conclusion that the public safety is not served by retaining jurisdiction in the juvenile court. Although J.L.B.'s experts stated that they did not believe J.L.B. to be dangerous, the trial court believed that J.L.B. managed to conceal dangerous aspects of his personality from the experts. The court noted that J.L.B. had lied about parts of the incident.

Dr. Olmsted testified that J.L.B. "put a lot of energy into keeping the lid on" and that at a subconscious level, there could be anger and aggressive potential. McAllister stated that J.L.B. may have considerable unconscious hostility. Two of the psychological tests administered to J.L.B. were invalid because of defensiveness. Olmsted testified that at one point while evaluating J.L.B., Olmsted was concerned as to whether J.L.B. was trying to overplay a good impression, and whether some of his statements were credible. J.L.B.'s experts characterized him as non-violent. Both experts, however, refused to say that J.L.B. could not commit a violent act. In addition, the court found that J.L.B. had made statements to others at school that he could kill someone and get away with it, and that he wanted to kill R.C.

In light of this evidence, the trial court could believe that the experts' opinions did not accurately reflect J.L.B.'s personality or potential risk to society. Unfortunately, the trial court did not have the guidance of the recent decisions in *D.F.B.* when it formulated its opinion. We cannot say, however, that the trial court clearly abused its broad discretion in this area.

 Additionally, we believe that reference would be justified on the alternative

ground of unamenability to treatment. The trial court's memorandum indicates that the court considered the significance of the time remaining for treatment before J.L.B. reached age nineteen. At the time of the reference hearing J.L.B. was eighteen years and four months old. The probation officer who performed the reference study testified that given the time limits here, she did not believe there was any appropriate place for J.L.B. in the juvenile system. Dr. Olmsted administered psychological tests and testified that in his opinion, considering J.L.B.'s age and the type of problem involved, there would not be sufficient time for treatment. Under these circumstances, the trial court could find that J.L.B. could not be successfully treated within the time remaining before the juvenile court's jurisdiction is terminated. This is a proper basis for concluding that a juvenile is unsuitable for treatment. *See Dahl*, 278 N.W.2d at 319.

Consequently, we believe that the trial court did not abuse its considerable discretion in determining that J.L.B. should be referred to adult court for prosecution. There is sufficient evidence in the record to support the trial court's decision.

## DECISION

The trial court did not abuse its discretion in determining that reference to adult court for prosecution is justified.

AFFIRMED.

CRIPPEN, J., dissents.

CRIPPEN, Judge, dissenting.

The trial court's decision rests on an erroneous pronouncement of law. Because to affirm under governing law we must assume clear and convincing evidence where there is none, I respectfully dissent.

### I. Error

The trial court concluded the prosecuting authority demonstrated by clear and convincing evidence that public safety would not be served by further juvenile court proceedings. The court erred in reaching this conclusion by relying emphatically and

singularly on the circumstances of the offense and the age of the offender.

Consistent with the scheme of Minnesota's juvenile laws, the supreme court has concluded that a legal reference order aimed at public safety depends upon evidence of dangerousness other than the offender's age and the circumstances of the offense. *In re Welfare of Dahl*, 278 N.W. 2d 316, 320–21 (Minn.1979); *In re Welfare of K.P.H.*, 289 N.W.2d 722, 725 (Minn. 1980); *In re Welfare of D.F.B.*, 433 N.W.2d 79, 81 (Minn.1988) (refuting construction of statute such that "reference is justified any time a juvenile commits a heinous offense"). The trial court's decision here directly contradicts *Dahl* and its progeny.

The trial court concluded:

This court remains of the opinion that proof that the juvenile defendant is a dangerous person is no longer required. Regardless of whether the juvenile is likely to commit future crimes, the public safety is not served unless, in the absence of such mitigating facts as would justify retention of juvenile jurisdiction, serious criminal behavior is effectively punished with 'just desserts.' The public safety further requires that Court decisions be consistent with a generally held impression by the public that serious criminal activity will surely result in serious punishment.

In any homicide case, the court observed, the criminal justice system must respond "strongly and punitively." Appellant "deserves," the court says, to stand trial as an adult and, if convicted, "to be sentenced as an adult to an extended period of imprisonment."

Discussions of dangerousness, the court concluded, are "mere artifice and rhetoric." The court found support for its holding by reference to prior decisions of this court. *See, e.g., In re Welfare of S.R.L.*, 400 N.W. 2d 382, 384 (Minn.Ct.App.1987) (stating that subsequent juvenile code amendments "implicitly overrule" *Dahl* ), *pet. for rev. denied* (Minn. Mar. 25, 1987). The supreme court, however, has not repudiated the *Dahl* case, and recently renewed its holding that reference is not justified solely

by proof of a heinous offense. *D.F.B.*, 433 N.W.2d at 81.

The rationale for reference here is in clear contrast with controlling law. Under the circumstances, the Minnesota appellate courts do not have the freedom to endorse the error. To do so, among other things, sends to the bench and bar a badly distorted portrayal of present law.

## II. Safety

If in addition to the current offense, the record contains adequate evidence that appellant "endangers the public," reference may be appropriate for the sake of public interests. *Dahl,* 278 N.W.2d at 321; *D.F.B.,* 433 N.W.2d at 80 (reference affirmed, based on a violent offense and the age of the offender, together with evidence of need for long term efforts of juvenile to deal with his aggression); *In re Welfare of T.L.C.,* 435 N.W.2d 581 (Minn.Ct.App.1989) (reference affirmed on evidence of cruel offense, plus evidence of prior cruel offense and personal sophistication).

Looking beyond the current offense, the record here includes remarkably meager evidence, if any at all, that appellant is personally dangerous. The record contains evidence on the dangerousness of appellant's conduct in the course of his alleged unlawful conduct, together with a remark before the incident about being able to kill someone or killing the young woman who later committed suicide. Appellant lied when questioned about the offense; if this is considered as unrelated to the offense, there is no evidence it is germane to dangerousness. Otherwise, the record is simply void of evidence that appellant endangers the public safety. Undisputed expert testimony indicates that appellant is not an aggressive or a dangerous person. According to the court-appointed psychologist, testing suggests that appellant's level of emotional control is about normal.

Observing an inference of dangerousness solely from appellant's offense, the trial court in its memorandum expressed a belief that appellant "likely" had "managed to conceal part of his personality from the experts, the dangerous underside * * *

that must have risen to the surface and influenced his behavior" when the alleged offense occurred. This conclusion is openly shaped by the offense and is not supported by the evidence. Experts observed the possibility of subconscious aggression of appellant but found no evidence he senses or acts on impulses of this kind.

Public safety considerations, other than those which are purely offense-based, include the availability of secure facilities, the individual's sophistication and maturity, and the prior record of behavior. *See* Minn.R.Juv.Cts. 32.05, subd. 2(f), (g), (h); *T.L.C.,* 435 N.W.2d at 583–584. There is no evidence here that secure facilities are needed in dealing with appellant. Undisputed evidence indicates that appellant is unsophisticated and immature. Appellant has no prior history of unlawful conduct or even school misbehavior.

Any doubt whether appellant could be referred for public safety reasons is defeated by the statutory requirement that proof of either unsuitability or a disservice to public safety be established by clear and convincing evidence. Minn.Stat. § 260.125, subd. 2(d)(2) (1988). The enlarged burden of the prosecuting authority was created by 1980 amendments to the juvenile act. 1980 Minn.Laws ch. 580, § 7. This amendment demonstrates the legislature's apparent ratification of the policies underlying the juvenile court system and the proposition that reference should be the exception and not the rule. Feld, *Juvenile Court Legislative Reform and the Serious Young Offender: Dismantling the "Rehabilitative Ideal,"* 65 Minn.L.Rev. 167, 206 (1981).

Based on the alleged offense, the trial court and this court can look skeptically at the expert opinions that appellant is not a dangerous or aggressive person. Neither court, however, can assume the experts were wrong; neither court can disregard the evidence solely because of the current accusation, and the record furnishes neither court with other evidence nearly clear or convincing on the question of dangerousness.

### III. Suitability

For reasons which are evident in light of the record, the trial court elected to make no finding that the condition of appellant made him unsuitable for the rehabilitative approach of the juvenile court. Looking beyond evidence on the alleged current offense, the evidence shows appellant has no unique problem that is unamenable to a rehabilitative approach. The evidence shows that appellant's current offense, if it occurred, is an isolated delinquent act in the life of an intelligent high school youth who is active in extracurricular sports activities, cycling, reading and personal hobbies, and whose worst performance problem has been the absence of academic achievements to the high level of his ability.

Three expert witnesses reported to the court the possibility that appellant be classified a person with a schizoid personality disorder. That disorder is not a mental illness, nor do the experts indicate that it is disabling. Rather, the disorder is one described as involving patterns of immaturity and detachment from personal relationships. As the trial court found, the condition does not relate to alleged offense and contradicts the likelihood of appellant being involved in serious unlawful conduct.

According to the testimony of the court-appointed psychologist, the personality pattern "might impair somebody's quality of life," it "might impair their ability to function on the job," but "in general without treatment an individual with this disorder could function in many circumstances in society." While appellant's experts suggest treatment may be helpful for appellant, there is no evidence that he needs it.

A probation officer in her reference report relayed observations of state corrections officers that placement in a state corrections facility would not be "adequate," because a "typical juvenile" would be placed for 18 months or more for "similar offenses." Other corrections facilities reportedly refused a placement because of the seriousness of the allegations and appellant's age. This is not evidence that any facet of appellant's individual condition prevented him from being "successfully treated" before he was 19. *See Dahl,* 278 N.W. 2d at 319; *see also* Minn.R.Juv.Cts. 32.05, subd. 2(k) (consideration of time needed for "appropriate treatment and control" of juvenile's condition).

As the trial court order indicates, the record does not permit a finding that appellant's condition makes him unsuitable for handling in juvenile court. Even more certainly, neither the trial court nor this court is free on this record to conclude that the unsuitability of juvenile court proceedings is proven here by "clear and convincing evidence." Minn.Stat. § 260.125, subd. 2(d)(2) (1988).

### IV. Reference law

What is the state of current Minnesota reference law?

The trial court, like scholars and judges on many earlier occasions, attempted to discern the legislature's will from the 1980 amendments to the Minnesota Juvenile Court Act. 1980 Minn.Laws ch. 580. Having regard for the recognition in this legislation that certain offenses constitute a prima facie showing of cause for reference, the trial court concluded "that the legislature intended that only in rare cases would the public safety be served by retaining juvenile jurisdiction where a 17 year old is charged with second degree murder." Also, we may bear in mind that the 1980 amendments altered the stated purpose of the act to include promotion of public safety and individual responsibility in delinquency cases. *Id.* § 3 (codified at Minn. Stat. § 260.011, subd. 2 (1988)); *D.F.B.,* 433 N.W.2d at 80–81.

As already observed, others find significance in the 1980 legislative decision to enlarge the state's burden in cases where there is no prima facie cause for reference or the prima facie cause has been rebutted. Feld, *Legislative Reform,* at 206. Given this emphasis, one can conclude that reference remains the exception and not the rule. *Id.* In addition, it is significant that the 1980 Minnesota Legislature openly rejected the notion that certain offenses are cause per se for reference, choosing instead to adopt a rebuttable prima facie

inference. *See* Feld, *Reference of Juvenile Offenders for Adult Prosecution: The Legislative Alternative to Asking Unanswerable Questions*, 62 Minn.L.Rev. 515 (1978) (proposing legislated reference for certain offenses).

It must be observed, in sum, that the juvenile court act provides for significant obstacles to reference, both in terms of procedure and standards. *See D.F.B.*, 433 N.W.2d at 80–81. It is evident the legislature defers to the body of opinion, sometimes disputed, that incarcerating young people in adult prisons for long terms is not a worthwhile correctional policy, especially when this practice includes young people who are not clearly dangerous or whose condition does not otherwise invite adult imprisonment. *See* Twentieth Century Fund Task Force on Sentencing Policy Toward Young Offenders, Confronting Youth Crime, 7, 9, 11, 25, 100 (1978) (recommendation and dissent on youth sentencing to reflect culpability of youth) [hereinafter cited as Twentieth Century Fund]; P. Greenwood & F. Zimring, One More Chance: The Pursuit of Promising Intervention Strategies for Chronic Juvenile Offenders (1985); Feld, *The Juvenile Court Meets the Principle of the Offense: Legislative Changes in Juvenile Waiver Statutes*, 78 J.Crim.L. & Criminology 471, 520–28 (1987) [hereinafter cited as *Waiver Statutes*].

## V. Our choices

In sum, on this record and under the law of the case, we cannot affirm the trial court. We are not free to assume facts nor can we disregard or replace rules of law determined by the legislature or the Minnesota Supreme Court.

It is equally evident, however, that reversal here is not a pragmatic decision. As the trial court observed, if juvenile court jurisdiction is to end at age 19, denial of reference leads to a "repugnant" result, a "travesty of justice." Upon reversal here, if the prosecuting authority succeeds in obtaining adjudication that appellant murdered another or aided in her suicide, both major felony offenses, the adjudication must occur in juvenile court and that court can make no disposition in the case because

appellant attained age 19 on January 28, 1989. Minn.Stat. § 260.181, subd. 4 (1988) (jurisdiction of juvenile court, at least for disposition purposes, ends when the individual becomes 19 years of age). *See In re Welfare of C.A.N.*, 370 N.W.2d 438, 442 (Minn.Ct.App.1985) (permitting juvenile court adjudication after an offender turns 19 where reference of the case to adult court can no longer occur).

Thus, according to the existing scheme of reference law and corrections law, we are dealing here once again with the case of a young person's isolated but serious offense where the courts must elect between two intolerable results.

It seems compelling to me that we do two things in these circumstances. First, we must make as clear as possible to the legislature the need to grapple with the issue of corrections policy for young offenders. Second, pragmatic or not, we must reverse the trial court decision in this case.

## VI. Corrections law

As stated above, reference laws continue to restrict the choice for long term imprisonment of young offenders. The legislature must be urged to confront the need for means to control, often for a number of years, young offenders whose cases appropriately are not referred.

The depths of the current reference problem were reached in 1982 when in response to Department of Corrections concerns for its handling of young offenders, the legislature reduced the maximum age for juvenile court jurisdiction from 21 to 19. 1982 Minn.Laws ch. 615, § 4. The law before this amendment left a more plausible choice in reference cases. Before 1975, Minnesota had an even more sensible court option under provisions for a Youth Conservation Commission with jurisdiction over young offenders until they attained age 25. Minn.Stat. §§ 242.01–08 (1971), *repealed by* 1973 Minn.Laws ch. 654, § 14, 1977 Minn. Laws ch. 392, § 14.

We cannot judge whether these youth corrections efforts had to be abandoned in the past, or whether they can be feasibly

restored. We can and should observe, however, that this kind of correctional program is vitally important to permit reasoned application of present legal standards that protect juvenile court jurisdiction. If an adequate alternative is developed for serious young offenders, the judiciary will be duly freed from the absurd choices it now faces in dealing with those who are not habitually delinquent but who have committed a serious offense.

Alternatively, if purely offense-based reference is appropriate, if *Dahl* is to be ignored, the legislature must so determine. With that decision, and grappling with conflicting views on sentencing of young offenders, the legislature should decide whether a young defendant, especially in a case of a serious but isolated crime, should be sentenced in adult court to a different term and a different facility than other defendants. Twentieth Century Fund, at 9–11, 100; Feld, *Waiver Statutes*, at 520–28.

### VII. Reversal

In my opinion, to affirm the erroneous reference here has consequences which are as objectionable as those which follow reversal.

First, we are bound by the rule of law and do not evade that burden by finding practical reasons for another result. *See Dahl*, 278 N.W.2d at 319 (no matter how pragmatic, reference statutes must be followed; court reversed and remanded reference of a first degree murder accusation against a youth who turned 19 before the appellate opinion was filed). Judicial restraint is at issue here, and it certainly must be respected where individual freedom is at stake, not alone where it is imperiled.

Also, our correct application of the law gives sound guidance to the bench and bar on the gathering, presentation and assessment of evidence in future cases.

As in *Dahl*, an appropriate decision under the law sounds a needed alarm for lawmakers who should address this issue. We should be duly concerned about the continued need for judicial choices from among equally unacceptable options.

In addition, absent a legislative policy decision, it should not be assumed by the juvenile court that lengthy incarceration in an adult prison represents constructive corrections policy for juveniles who commit serious but isolated offenses. A different view has prevailed in the shaping of reference laws. Evidence in this case shows that an adult disposition will serve no rehabilitative purpose and will predictably damage the individual. Further research, deliberation and decision on correctional policy for these cases is a legislative prerogative.

Finally, it should be observed that there are constitutional questions looming in the wake of loose permission for references based solely on the circumstances of an offense and the age of an offender. First, offense-based references enlarge the predominance of a punishment standard in determining juvenile court dispositions, and the weight of the demand that persons before this court have further procedural safeguards, including the right to trial by jury. *See In re Welfare of D.S.F.*, 416 N.W.2d 772, 777 (Minn.Ct.App.1987) (Crippen, J., dissenting), *pet. for rev. denied* (Minn. Feb. 17, 1988).

Equally important, added attention will have to be given to due process problems surrounding the open opportunity to improperly manipulate reference results by delaying initiation of the juvenile court process. *See, e.g., In re Welfare of R.J.C.*, 419 N.W.2d 636 (Minn.Ct.App.1988). While not raised as an issue in the present case, the facts here indicate the significance of prosecutorial delay. Although appellant was implicated in this matter within hours after an incident on April 9, 1987, a juvenile petition in the case was not filed until April 1988. Appellant was age 17 when the alleged offense occurred, and he was seven months away from his 19th birthday by the time the reference decision was made.

For these reasons, I would reverse.