**In the Matter of the WELFARE OF S.J.G., a Child.**

**No. C7–95–2073.**

Court of Appeals of Minnesota.

May 14, 1996.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, James Backstrom, Dakota County Atty., Jean M. Mitchell, Asst. County Atty., Hastings, for Respondent Dakota County.

John M. Stuart, State Public Defender, Charlann Winking, Asst. State Public Defender, Minneapolis, for Appellant S.J.G.

Considered and decided by LANSING, P.J., and RANDALL and MULALLY, JJ.

## OPINION

EDWARD D. MULALLY, Judge.*

Dakota County instituted a delinquency proceeding against appellant S.J.G., alleging that he had committed one count each of aiding and abetting attempted first-degree

murder, aiding and abetting attempted second-degree murder, aiding and abetting aggravated robbery, aiding and abetting first-degree assault, and two counts of aiding and abetting second-degree assault. Appellant challenges the district court order certifying him for adult prosecution, claiming that he should be treated as an extended jurisdiction juvenile (EJJ). We affirm the certification.

## FACTS

On January 17, 1995, at about 9:00 p.m., appellant and J.A.P., also a juvenile, entered the U.S. Discount Store in West St. Paul. One employee, Daniel Lexau, and his friend, Michael Zenzola, were in the store. Appellant, who was fifteen at the time, was carrying a sawed-off shotgun.

Appellant told Lexau and Zenzola that this was a "stick-up" and demanded money. Lexau and Zenzola laughed, thinking it was a joke. Appellant then fired a shot into a display rack. As Lexau ran towards the front door of the store, appellant fired a second shot that struck Lexau in the lower back. J.A.P. tried unsuccessfully to open the cash register, grabbed a carton of cigarettes, and left the store with appellant.

The gun used in the incident belonged to L.B.K., who said that he had previously robbed the store. L.B.K. told appellant and J.A.P. that an "Iraqi" owned the store and that they should shoot the "Iraqi" if there were any problems. L.B.K. helped plan the crime, went to the store with appellant and J.A.P., and waited outside while they committed the robbery.

Appellant admitted to participating in the robbery. He told investigators that he only remembered firing one shot after Lexau lunged at him. He confirmed that the gun belonged to L.B.K. and said that L.B.K. first showed him the gun outside the store. Appellant denied planning the crime until immediately before entering the store.

Appellant has one prior delinquency adjudication for an aggravated robbery offense

---

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

that occurred in December 1994. Appellant admitted to the offense and was placed in a group home. After running away from the group home, he was placed at St. Croix Camp. These were his only juvenile court-ordered placements. Appellant also admitted to a felony theft of a motor vehicle and a misdemeanor theft. Adjudication was stayed on both of these offenses, and appellant was placed on probation.

Drs. Alsdurf and Nelsen testified at the certification hearing and recommended that appellant be treated as an EJJ, rather than certified as an adult. Dr. Alsdurf, the court-appointed psychologist, testified that appellant was a "rather limited young man" with a full scale I.Q. of 77, indicating borderline intellectual functioning. Dr. Alsdurf described appellant's level of maturity as "four going on fourteen." Because of appellant's low I.Q., his capacity for learning is delayed and poor, and he has some limits in problem solving, social judgment, and complex reasoning. Dr. Alsdurf diagnosed appellant as having dysthymia (mild depression) and possessing schizoid and dependent personality traits. Dr. Alsdurf testified that these diagnoses would not cause someone to engage in violent behavior.

Dr. Alsdurf opined that the public safety would best be served by treating appellant as an EJJ, rather than certifying him as an adult. He testified that a significant time in the adult system could cause appellant to become a "much more combustible, unpredictable person." After considering the factors set out in Minn.Stat. § 260.125, subd. 2b (1994), Dr. Alsdurf acknowledged that the offense was serious and that appellant was culpable as the shooter. Dr. Alsdurf felt, however, that appellant's minimal delinquent history and low intellectual functioning mitigated against certification. Dr. Alsdurf testified that appellant's needs had never been addressed by the juvenile system in any complete fashion.

Dr. Nelsen, appellant's expert psychologist, also recommended treating appellant as an EJJ. Dr. Nelsen described appellant as having borderline intellectual functioning with a particular weakness in analytical reasoning. He also described appellant as ex-hibiting depressive symptoms, with "incredibly low self-esteem." Dr. Nelsen agreed with Dr. Alsdurf that if appellant were sent to prison and not provided with treatment, he would pose a greater risk to the public safety in the future.

The state presented the testimony of Dakota County Probation Officer Ronald Cunningham, who prepared the reference study. After reviewing the statutory factors, Cunningham recommended that appellant be certified as an adult. Cunningham viewed the offense as very serious, with particular cruelty to the victim. He found no mitigating factors regarding appellant's culpability and noted that appellant had three prior offenses.

After weighing all the testimony, the district court concluded that the state had proved by clear and convincing evidence that the public safety would not be served by treating appellant as an EJJ. The court found that (1) "the alleged offense was extremely serious, involving the use of a firearm," (2) appellant had acted with "particular cruelty," (3) appellant "played a major role in carrying out the alleged offenses," and (4) appellant had "shown himself to be unamenable to probation during the short time he had been with the juvenile system." Although the court recognized that appellant did not have an extensive record of delinquency, the court stated that

his escalating behavior in a short period of time with increasing violence toward persons and culminating in the pending charges suggests the child poses a substantial risk to public safety.

The court found that the punishment and programming available under a juvenile delinquency disposition were inadequate because of the threat that appellant poses to the public safety and his need for long-term treatment in a secure setting. With regard to EJJ, the court stated:

The Court has also considered whether designating [appellant] an [EJJ] would serve the public safety. Given the limited treatment options available in the juvenile system, one last chance at juvenile programming would not serve public safety. The juvenile is unlikely to succeed in the treatment options that are available given

the juvenile's multiplicity of psychological problems, inability to gain insight due to his intellectual disabilities, and his poor performance in a behavior modification program that was already tried.

## ISSUE

Did the state show by clear and convincing evidence that the public safety would not be served by retaining appellant in the juvenile system as an extended jurisdiction juvenile?

## ANALYSIS

■ A district court's decision to certify a juvenile for adult prosecution will not be reversed " 'unless [the court's] findings are clearly erroneous so as to constitute an abuse of discretion.' " *In re Welfare of S.W.N.*, 541 N.W.2d 14, 16 (Minn.App.1995) (quoting *In re Welfare of J.L.B.*, 435 N.W.2d 595, 598 (Minn.App.1989), *review denied* (Minn. Mar. 17, 1989)), *review denied* (Minn. Feb. 9, 1996).

The EJJ classification found in Minn.Stat. § 260.126 (1994) was explained in *S.W.N.* as follows:

> Under an EJJ prosecution, the child will be given both a juvenile disposition and an adult criminal sentence upon a finding of delinquency; the criminal sentence will be stayed, however, on the condition that the child not violate the terms of the juvenile disposition or commit a new offense. In addition, the juvenile system's jurisdiction over the child extends past the child's nineteenth birthday * * * until the child turns 21.

*S.W.N.*, 541 N.W.2d at 15 (citations omitted).

A juvenile court may order certification if the court finds that the presumption of certification does not apply[1] and that the prosecutor has shown "by clear and convincing evidence that retaining the proceeding in the juvenile court does not serve public safety." Minn.Stat. § 260.125, subd. 2(6)(ii) (1994). In determining whether the public safety is served, the district court considers the following factors:

(1) the seriousness of the alleged offense in terms of community protection, including the existence of any aggravating factors recognized by the sentencing guidelines, the use of a firearm, and the impact on any victim;

(2) the culpability of the child in committing the alleged offense, including the level of the child's participation in planning and carrying out the offense and the existence of any mitigating factors recognized by the sentencing guidelines;

(3) the child's prior record of delinquency;

(4) the child's programming history, including the child's past willingness to participate meaningfully in available programming;

(5) the adequacy of the punishment or programming available in the juvenile justice system; and

(6) the dispositional options available for the child.

In considering these factors, the court shall give greater weight to the seriousness of the alleged offense and the child's prior record of delinquency than to the other factors listed in this subdivision.

Minn.Stat. § 260.125, subd. 2b.

■ Appellant challenges the district court order certifying him for adult prosecution, arguing that Cunningham's opinion should be given very little weight because he did not consider EJJ as an alternative when he prepared the reference study and because he had only prepared six prior certification studies, all under the pre–1995 reference law. Appellant also contends the evidence does not support the district court's conclusion that he is "unlikely to succeed in treatment."

The record shows that the district court made detailed findings on each of the six statutory factors. Although Cunningham did not address EJJ as an alternative in the reference study, he did address each of the six statutory factors and separately testified that EJJ designation was not appropriate.

1. A proceeding is presumptively certified if (1) the child was 16 or 17 at the time of the offense and (2) either the offense is one that would result in a presumptive commitment under the sentenc-

ing guidelines or the child used a firearm in committing the offense. Minn.Stat. § 260.125, subd. 2a (1994). This presumption does not apply here.

**460**

While both Drs. Alsdurf and Nelsen recommended EJJ status, they both expressed reservations regarding the chances of appellant's successful treatment. Dr. Alsdurf testified that he had "serious concerns" about whether appellant would be successful in treatment. Dr. Nelsen's evaluation stated that "[a]t times * * * [appellant's] primary motive may be more to ingratiate himself to treatment staff then to progress in treatment." Dr. Nelsen testified that appellant clearly posed a threat to the public safety. In addition, the record indicates that appellant ran away from a court-ordered placement in a group home and allegedly committed several offenses during the time he was on his own.

Given the district court's considerable latitude in determining whether to certify a juvenile for adult prosecution, we conclude the district court did not abuse its discretion in certifying appellant for adult prosecution.

## DECISION

The district court did not err in concluding that the state met its burden of showing by clear and convincing evidence that an EJJ designation would not serve the public safety. Accordingly, we affirm the district court order certifying appellant for adult prosecution.

**Affirmed.**

RANDALL, J., dissenting.

RANDALL, Judge (Dissenting).

I respectfully dissent. The state simply failed to prove convincingly that public safety is not served by retaining this proceeding in juvenile court.

As the majority correctly points out, a juvenile court may order a juvenile certified as an adult only if the court finds that the presumption of certification does not apply, and the prosecutor has shown by clear and convincing evidence that retaining the proceeding in the juvenile court does not serve the public safety. Minn.Stat. § 260.125, subd. 2(6)(ii) (1994)(emphasis added). In determining whether public safety is served, the juvenile court is to consider the six factors set out in Minn.Stat. § 260.125, subd. 2b(1)-(6). These include: 1) the seriousness

of the alleged offense, 2) the culpability of the child, 3) the child's prior delinquency, 4) the child's programming history, including the child's past willingness to participate in such programming, 5) the adequacy of the punishment or programming in the juvenile justice system, and 6) the dispositional options available for the child. Minn.Stat. § 260.125, subd. 2b(1)-(6).

Adult certification is not warranted every time a juvenile commits a serious crime. *In Re Welfare of D.F.B.,* 433 N.W.2d 79, 81 (Minn.1988); *See In Re Dahl,* 278 N.W.2d 316, 320 (Minn.1979) (juvenile court petition charging 17 year old with first-degree murder not automatically subject to adult certification). The juvenile court may, after a certification hearing, designate the child as an Extended Jurisdiction Juvenile (EJJ), rather than certifying the juvenile to adult court. Minn.Stat. §§ 260.125, subd. 5, 260.126, subd. 1(1). Under the new EJJ prosecution, the juvenile is given both a juvenile disposition and an adult criminal sentence upon the finding of delinquency; then the adult criminal sentence is stayed on the condition that the child not violate the terms of the juvenile disposition or commit a new offense. Minn. Stat. § 260.126, subd. 4(a)(1), (2). The jurisdiction of the juvenile court is extended past the juvenile's nineteenth birthday until the child turns twenty-one. Minn.Stat. § 260.181, subd. 4(b). This law, the EJJ certification process, was passed specifically to benefit juveniles like appellant.

Appellant is too young for a presumptive certification. Thus, the burden was on the state to prove by clear and convincing evidence that the public safety is not served by retaining the proceedings in juvenile court. Minn.Stat. § 260.125, subd. 2(6)(ii). The state presented little credible evidence that EJJ treatment was inadequate to protect public safety.

Only Dakota County Probation Officer Ronald Cunningham testified that appellant should be certified as an adult. We note that Cunningham **did not even address EJJ** in the reference report he filed with the court. When questioned at the reference hearing why EJJ prosecution was inappropriate,

Cunningham expressed his concern that if treatment did not work "by the age of nineteen," or if appellant did not succeed in treatment, the court would have no further options available because of limited resources available for juveniles. His statement makes it clear that Cunningham did not understand the point of an EJJ prosecution or understand the law.

The purpose behind EJJ is to give the juvenile "one last chance at success in the juvenile system, with the threat of adult sanctions as an incentive not to reoffend." Minnesota Supreme Court Advisory Task Force on the Juvenile Justice System, *Final Report*, p. 33 (1994). Realizing that meaningful treatment cannot always be accomplished within a short period of time, an EJJ prosecution allows a juvenile court to exercise jurisdiction over a juvenile for an extended period of time, so that meaningful treatment may be provided to the juvenile. Under EJJ, if it becomes clear that a juvenile is not cooperating with treatment, or if he or she reoffends, the court is then able to send the juvenile to prison by executing his stayed adult sentence. Minn.Stat. § 260.126, subd. 5. This necessarily accomplishes the twin goals of satisfying the public that juvenile offenders are handled appropriately and then handling them appropriately. *In re M.J.B.*, 509 N.W.2d 920, 924 (Minn.App. 1993), *review denied* (Minn. Feb. 24, 1994) (Randall, J., concurring).

Here, the only two psychologists to evaluate appellant recommended that he be treated as an extended jurisdiction juvenile. Dr. James Alsdurf, the court appointed examiner, a licensed clinical psychologist, conducted a psychological evaluation of appellant and testified at the hearing. Dr. Alsdurf testified that appellant "was a rather limited young man," with a full scale I.Q. of 77, indicating borderline intellectual functioning. He stated that because of appellant's low I.Q., his capacity for learning is delayed and poor, and appellant has limits in problem solving, social judgment, and complex reasoning. Dr. Alsdurf also diagnosed appellant as having dysthymia (mild depression) and possessing schizoid and dependent personality traits. Although Dr. Alsdurf observed that appellant has some "bizarre ideation," he ruled out any psychotic disturbance. According to Dr. Alsdurf, these diagnoses would not cause someone to engage in violent behavior. Dr. Alsdurf did testify that given appellant's personality traits, he is not in a highly predictable successful category for treatment but then went on to testify that the new EJJ law was "made for kids like" appellant. He believed that public safety would be best served by treating appellant as an EJJ rather than certifying him as an adult. Dr. Alsdurf concluded that appellant would become more dangerous after spending time in an adult prison because then he would be susceptible to abuse, violation, and control by other inmates. Dr. Alsdurf stated that a significant time in the adult system would create a "much more combustible, unpredictable person" than exists now. Dr. Alsdurf concluded that treatment rather than incarceration **would better contribute to community safety.**

Dr. Alsdurf testified further that appellant's needs had never been addressed by the juvenile system in any complete fashion. Dr. Alsdurf characterized appellant's programming history in the juvenile system as "rather limited" and St. Croix Camp as "quasi-treatment." In Dr. Alsdurf's opinion, three juvenile treatment programs existed that would adequately address appellant's needs. Dr. Alsdurf also testified that given the fact that the court would have jurisdiction over appellant for nearly six years under EJJ, at appellant's age, EJJ would be viewed as "extremely punishing."

Dr. Alsdurf's testimony and recommendations were supported by Dr. Owen Nelson, a licensed psychologist. Dr. Nelson reviewed the tests conducted by Dr. Alsdurf and administered two additional tests on appellant as well. It was also his recommendation that appellant be treated as an EJJ. Dr. Nelson described appellant as having borderline intellectual functioning with a particular weakness in analytical reasoning. He described appellant as exhibiting depressive symptoms, with an "incredibly low self-esteem." According to Dr. Nelson, appellant has an

"overwhelming dependency and . . . the overwhelming need to have the open approval and . . . affection of others." In Dr. Nelson's opinion, appellant needed treatment to help him develop self-esteem so that he could make his own decisions rather than attempting to please others.

Despite the nature of appellant's crime, Dr. Nelson did not consider adult prison appropriate for appellant. Dr. Nelson agreed with Dr. Alsdurf that appellant would pose a greater risk to public safety in the future if he were sent to adult prison and not provided with treatment. Dr. Nelson testified that public safety would be "in great jeopardy" if appellant were not treated.

Thus, it is clear that the competent evidence against certifying appellant as an adult, as compared to the evidence for certification, was overwhelmingly in favor of EJJ status. Both experts, Dr. Alsdurf and Dr. Nelson, concluded that certifying appellant as an adult would do more to jeopardize public safety than it would do good. Instead of crediting this uncontradicted testimony of the only experts to testify, the juvenile court chose to credit the testimony of a probation officer whose knowledge and understanding of EJJ is questionable. I can only conclude that the juvenile court misinterpreted the background and driving force of EJJ and in doing so abused its discretion.

I also find the contention that appellant is unamenable to treatment without any support in the record. Both Dr. Alsdurf and Dr. Nelson concluded that appellant has never been provided nor offered adequate treatment within the juvenile system for his problems. How can it be argued that appellant is unamenable to treatment when he has not been provided meaningful treatment? If anything, the record indicates that appellant is amenable to treatment. While attending the Fresh Start program in the St. Paul schools, appellant did well. His attendance was perfect, he often arrived at school early to speak with the instructor, and although not required to do so, appellant went to school during the summer. His instructor stated that he responded readily to "adult nurturance and supervision." Thus, in the one instance where appellant was placed into a program attuned, in part, to his needs, he responded in an overwhelmingly positive manner.

In addition, at appellant's age the juvenile court would still have nearly seven years of jurisdiction remaining if he were designated an EJJ. During this time, the juvenile court could order appellant into one of several treatment programs, thus providing appellant with the opportunity to get real treatment for his problems. Dr. Alsdurf, Dr. Nelson, and Estelle Bouchard, a dispositional advisor with the First District Public Defender's Office, all indicated that several treatment programs were available for appellant. The danger that treatment might not work, or that appellant might reoffend, is beside the point. EJJ carefully considers the possibility of recidivism and provides a common sense and reasonable guard. The juvenile court under EJJ retains the virtually fool-proof options of reimposing EJJ or executing the adult sentence. If appellant is unamenable to treatment, or if he reoffends, the court retains perfect control. It has the option of executing his adult sentence.

This is the precise point of an EJJ prosecution—to provide the juvenile with the chance to undergo meaningful treatment, while at the same time holding the threat of an adult sentence over the head of the juvenile in case he chooses not to cooperate with treatment or decides to commit another offense. It is a new option given to juvenile court judges, an option fashioned after an extensive statewide study and after a painstaking review by the Minnesota legislature. The decision in this case is as if EJJ never existed.

The record shows that the state has not clearly and convincingly established that public safety will be served by certifying appellant as an adult. The record shows that the uncontradicted testimony of the only expert witnesses to testify overwhelmingly indicates that adult certification would do more to jeopardize the public safety than designat-

ing appellant as an extended jurisdiction juvenile. The juvenile court erred in its application of the law and abused its discretion in evaluating the evidence in the record. I dissent and would have reversed the juvenile court. I find as a matter of law that appellant and public safety unequivocally are best served by extended juvenile jurisdiction.