**In the Matter of the WELFARE OF D.T.H., Child.**

No. C7–97–540.

Court of Appeals of Minnesota.

Dec. 23, 1997.

Review Denied Feb. 19, 1998.

John M. Stuart, State Public Defender, Charlann E. Winking, Assistant State Public Defender, Minneapolis, for appellant child.

Hubert H. Humphrey III, Attorney General, St. Paul, and Boyd Beccue, Kandiyohi County Attorney, Deborah R. Peterson and Jennifer K. Fischer, Assistant County Attorneys, Willmar, for respondent.

Considered and decided by PETERSON, P.J., and DAVIES and FORSBERG, JJ.

## OPINION

THOMAS G. FORSBERG, * Judge.

This appeal is from an order certifying appellant D.T.H. to stand trial as an adult on charges of first-degree murder, in violation of Minn.Stat. § 609.185, subd. 1 (1996), and two counts of second-degree murder, in violation of Minn.Stat. § 609.19, subd. 1(1) (1996). At the time of the offense, D.T.H. was 15 years, 9 months of age. We affirm.

## FACTS

On October 28, 1996, Bruce Johnson, 51, and Grace Christiansen, 81, were reported missing, and Christiansen's vehicle, a 1977 Mercury, was reported stolen to the Kandiyohi County Sheriff's Department. Johnson and Christiansen were last seen alive near Belgrade, Minnesota, on October 27, 1996. On or about that date, Johnson and Chris-

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. const. art. VI, § 10.

tiansen were killed with a six-shot .22 caliber revolver in a cornfield five miles south of Willmar, Minnesota. Johnson was shot a total of eight times, four times in the chest, three times in the back, and once in the back of the head, which was the fatal shot. Christiansen's body was found crouched, face down, in a fetal position. She had been shot twice, once in the face at extremely close range, and the lethal shot was to the back of the head. The bodies of Johnson and Christiansen were found on October 29, 1996, and were identified by authorities the next day.

The delinquency petition, including allegations assumed to be true for purposes of the certification hearing, alleges that D.T.H., while a runaway from his home, broke into a vacant mobile home, where he stole a .22 caliber revolver and 400 rounds of ammunition. He also left behind a keychain at the trailer. D.T.H. then went to Christiansen's farmhouse, and encountered Christiansen and Johnson. Johnson was helping Christiansen pick potatoes.

D.T.H. told police that he and his father had hunted near Christiansen's farm and that she recognized him. He stated he approached Christiansen and Johnson for a ride to Willmar, and they agreed. When they got to Willmar, D.T.H. claimed that he asked to get out, but that Johnson told him to "shut up" and started driving out into the country, where Johnson attacked D.T.H. in a cornfield. D.T.H. claimed that Johnson had the gun and was shot in a struggle, and that Christiansen was shot accidentally.[1] D.T.H. claimed that he left the scene without seeking help because he did not think anyone would believe him.

D.T.H.'s juvenile record consisted of grand theft in South Dakota, for which he was under house arrest when he ran away, and a 1995 gross misdemeanor criminal damage to property. The state also charged him with first-degree burglary for breaking into the mobile home as part of this incident.

Pamela Combs, a probation officer, recommended certification based on the public safety factors enumerated under Minn. R. Juv. P. 18.05, subd. 3. The state's psychiatrist, Dr. Carl Malmquist, recommended certification as an adult as the only viable option; Dr. Malmquist could not recommend treatment because D.T.H. would not cooperate with him.

Dr. Robert Riedel, appointed by the court to conduct a psychological evaluation on D.T.H., was ordered to base his opinion on the statutory factors for certification. Dr. Riedel testified that D.T.H. showed evidence of a personality disorder, which but for D.T.H.'s age would be considered antisocial personality disorder. Because D.T.H. was under 18, this disorder was classified as conduct disorder. Dr. Riedel characterized conduct disorder as a learned disorder, rather than a genetic condition, something that would require long treatment periods and had a poor prognosis. Dr. Riedel further testified that D.T.H. showed a distinct lack of remorse. He noted that D.T.H. had minimal experience with juvenile programs and that D.T.H. needed to face appropriate consequences for his offenses. Dr. Riedel cautioned that because there was no emotional or cognitive disorder to treat, the law would not require D.T.H. to stay in a treatment program until he showed improvement, but would instead release him automatically when he reached a certain age.

In his report, Dr. Riedel relied on school records showing D.T.H. had been involved in two fighting incidents. Applying the diagnostic criteria for conduct disorder, Dr. Riedel concluded these fights were evidence that D.T.H. "bullies, threatens, or intimidates others." However, Jack Harris, a school counselor, testified that D.T.H. did not exhibit severe disruptive behavior and was not a discipline problem.

Further, in examining the criteria for antisocial personality disorder, Dr. Riedel indicated that one of D.T.H.'s fights "was very severe." Dr. Malmquist testified that he understood that one of the school fights involved another student punching D.T.H. first, followed by retaliation.

---

1. D.T.H.'s statements are completely inconsistent with the findings of the examiner who analyzed the crime scene and the victims' wounds.

In his report, Dr. Riedel emphasized that D.T.H. was "currently expressing no remorse" concerning the current offense. He further noted:

> In general, [D.T.H.] does not suffer from any mental or emotional impairment and would thus not be a candidate for treatment for any of these disorder[s]. * * * Additionally, this juvenile is showing no remorse for any of these offenses which would not prognosticate in the direction of public safety if he were tried as a juvenile * * *. Even with extended jurisdiction [juvenile] the release could be made without any sign of positive response to treatment and the severity of the crimes and [D.T.H.'s] lack of remorse are serious impairments to this being a psychologically reasonable conclusion.

Dr. Riedel concluded that public safety required D.T.H. be tried as an adult.

The court found probable cause that D.T.H. had committed crimes alleged in the delinquency petition and granted the state's motion to certify D.T.H. as an adult.

## ISSUE

Did the district court abuse its discretion in ordering certification to adult court?

## ANALYSIS

A district court has "considerable latitude" in deciding whether to certify a case for adult prosecution. *In re Welfare of J.L.B.*, 435 N.W.2d 595, 598 (Minn.App.1989), *review denied* (Minn. Mar. 17, 1989). Its decision will not be reversed "unless [the court's] findings are clearly erroneous so as to constitute an abuse of discretion." *In re Welfare of T.L.J.*, 495 N.W.2d 237, 240 (Minn.App.1993).

A presumption of certification applies when a 16– or 17–year–old uses a firearm to commit specified offenses. *See* Minn.Stat. § 260.125, subd. 2a (1996) (presuming certification when offense is felony using gun or offense with guidelines presumptive prison sentence). Because D.T.H. was only age 15 at the time of the offense, this presumption of certification does not apply.

In a nonpresumptive case such as this, the court may order certification if the state demonstrates "by clear and convincing evidence that retaining the proceeding in the juvenile court does not serve public safety." Minn.Stat. § 260.125, subd. 2(6)(ii) (1996). In making this determination, the court must consider the following factors:

(1) the seriousness of the alleged offense in terms of community protection, including the existence of any aggravating factors recognized by the sentencing guidelines, the use of a firearm, and the impact on any victim;

(2) the culpability of the child in committing the alleged offense * * *;

(3) the child's prior record of delinquency;

(4) the child's programming history;

(5) the adequacy of the punishment or programming available in the juvenile justice system; and

(6) the dispositional options available for the child.

Minn.Stat. § 260.125, subd. 2b. The court must give greater weight to the seriousness of the alleged offense and the child's prior record of delinquency. *Id.*

The only factor that does not support certification in this case is factor (4) (juvenile's programming history), because it is undisputed that D.T.H. has not participated in any programs. However, the state presented substantial evidence on the remaining five factors, all of which weigh in favor of certification and on which the district court made extensive findings:

### Factor (1) (seriousness of the offense).

Certainly, there is no more serious threat to public or community safety than multiple murders with a firearm. Additional aggravating factors include the violence exhibited by the manner of the murders, which included shooting the victims multiple times, at close range, and leaving their bodies in a cornfield.

### Factor (2) (culpability of the juvenile).

As the district court found, D.T.H.'s "level of participation in this offense, in planning and carrying it out, is at the highest level." Evidence was presented that D.T.H. planned to run away, told his friends of his plan, and

acted alone. In addition, D.T.H. has exhibited no remorse for the murders, has demonstrated a total lack of conscience, and continues to attempt to shift responsibility for the deaths away from himself.

*Factor (3) (prior record of delinquency).*

D.T.H. has a prior record that includes a gross misdemeanor for crimes to another, criminal damage to property, grand theft auto, as well as a pending burglary charge for breaking into the vacant mobile home to steal a revolver, ammunition, and a parka. Considering the timing of these offenses, his criminal conduct has escalated greatly in the past year.

*Factors (5) and (6) (adequacy of punishment or programming available in the juvenile justice system and dispositional options available to the juvenile).*

The High Plains Rebound facility in Colorado was offered as a treatment facility, and the director of the program recommended that D.T.H. enter this program until he turned 21. However, the director offered no evidence that the program would be effective. In addition, Dr. Riedel suggested that because he could find no "problem" to treat, any treatment would be ineffective, and he specifically testified that a 62–month period was not long enough duration to successfully treat D.T.H. Dr. Malmquist also recommended certification as an adult as the only viable option.

Despite the evidence presented by the state on these factors, which includes the circumstances of the crimes and D.T.H.'s prior criminal history, D.T.H. insists that the district court abused its discretion in failing to require the state to present additional evidence of non-offense-related dangerousness. *See In re Welfare of K.P.H.*, 289 N.W.2d 722 (Minn.1980); *In re Welfare of Dahl,* 278 N.W.2d 316 (Minn.1979). However, non-offense-related evidence of dangerousness is not individually listed as a required factor to consider in the current statute, which was amended in 1994. *See* 1994 Minn. Laws ch. 576, § 14. In addition, the current statute expressly requires the court to give more weight to the seriousness of the offense and the prior criminal history when determining the threat to public safe-

ty. Minn.Stat. § 260.125, subd. 2b. Thus, it is questionable whether the current statute requires the state to present separate evidence of non-offense-related dangerousness.

Even if separate evidence of non-offense-related dangerousness is required, this case is distinguishable from the two supreme court cases setting out this requirement.

In *Dahl,* the supreme court reversed a certification order and remanded for further proceedings and more evidence. *Dahl,* 278 N.W.2d at 321. However, *Dahl* contained no psychological evaluation even though one was requested, and the juvenile had no prior criminal record and had an exemplary background.

In *K.P.H.,* the supreme court reversed a certification based on a lack of evidence of dangerousness. *K.P.H.,* 289 N.W.2d at 725. However, under the present statute, the juvenile in *K.P.H.* would have been retained in juvenile court. *See* Minn.Stat. § 260.125, subd. 2b. The trial court found that he was amenable to treatment; he did not commit the act (but was an accomplice); he was not aware the killing was contemplated, nor would he have condoned it or used the gun himself; and he argued against the killing.

Since the statute's enactment, the case most factually analogous to this case is *In re Welfare of S.W.N.,* 541 N.W.2d 14 (Minn. App.1995). In that case, the juvenile attempted to murder his mother, his brother, and his mother's boyfriend. The juvenile was one month short of his sixteenth birthday. The court concluded that the prosecutor only needed to show that retaining the juvenile in the juvenile system did not serve public safety. As to prior non-offense-related conduct, the court stated that even though the juvenile had no prior record of delinquency and the prosecutor presented no evidence that he had engaged in any harmful conduct other than the charged offenses, the certification order should be upheld. As in *S.W.N.,* D.T.H. has a conduct disorder, a total lack of conscience or remorse, and other emotional problems. In addition, D.T.H. has a prior juvenile record and the state presented expert opinions that he was dangerous. Ac-

cordingly, we affirm the district court's order for certification.

## DECISION

The district court did not err in concluding that the state met its burden of showing by clear and convincing evidence that certification serves public safety.

**Affirmed.**

DAVIES, Judge (dissenting).

I respectfully dissent. The record includes no evidence of dangerousness other than the charged offense. Additional evidence is required for certification as an adult. In addition, the trial court did not adequately consider the alternative disposition of extended jurisdiction juvenile (EJJ).

Minnesota courts have long required that juveniles not be certified as adults without evidence of dangerousness independent of the offense. *See In re Welfare of Dahl,* 278 N.W.2d 316, 321 (Minn.1979) (record must contain direct evidence that juvenile is a danger to public safety for statutory reference standard to be satisfied); *In re Welfare of S.W.N.,* 541 N.W.2d 14, 17 (Minn.App. 1995) (applying Dahl non-offense-related evidence of dangerousness requirement to EJJ case), *review denied* (Minn. Feb. 9, 1996); *In re Welfare of M.E. P.,* 523 N.W.2d 913, 925 (Minn.App.1994) ("state must present non-offense-related evidence of dangerousness in support of a reference motion"), *review denied* (Minn. Mar. 1, 1995). Even in cases in which a juvenile is charged with the most heinous offense, reference cannot be based solely on the juvenile's age and the seriousness of the crime. *In re Welfare of D.F.B.,* 433 N.W.2d 79, 81–82 (Minn.1988) (juvenile charged with ax murder of four family members).

The trial court here concluded that the lack of other violent behavior by D.T.H. did not weigh against certification. It treated the *Dahl* element of non-offense-related evidence of dangerousness as only one factor, and not even a weighty factor. But *Dahl, D.F.B.,* and other cases have consistently held other evidence to be a prerequisite to adult certification. The trial court ignored the lack of evidence of other violent behavior, or of any other indicia of dangerousness, and certified D.T.H. solely on the basis of the heinous nature of the double murder he is charged with. The majority contends the record of dangerousness here is similar to that in *S.W.N.,* but the juvenile in *S.W.N.* had also been diagnosed with explosive intermittent disorder and was under the influence of a violent father. *S.W.N.,* 541 N.W.2d at 17. Moreover, the court in *S.W.N.* was applying the threshold of proof necessary to sustain an EJJ designation, rather than the higher threshold necessary for adult certification. *Id.*

I also conclude that the trial court did not properly weigh options available to it under the EJJ statute. That statute allows the court to retain jurisdiction until age 21, Minn.Stat. § 260.181, subd. 4(b) (1996), and then to execute an adult criminal sentence if the juvenile violates the disposition order. Minn.Stat. § 260.126, subds. 4(a)(2), 5 (1996).

Also under EJJ, as part of the disposition order, the court could not only require that D.T.H. spend the five years until he is 21 in a juvenile high-security facility, Minn.Stat. § 260.185, subd. 1b (1996), but it could also require that he demonstrate satisfactory progress in treatment. In adult criminal cases, probation has been revoked if the offender fails in a treatment program that has been ordered as a condition of probation, or even if the treatment program ceases to exist or the offender's participation in it cannot be funded. *See State v. Morrow,* 492 N.W.2d 539, 543–44 (Minn.App.1992) (revocation for lack of funding); *State v. Thompson,* 486 N.W.2d 163, 165 (Minn.App.1992) (termination of program); *State v. Moot,* 398 N.W.2d 21–24 (Minn.App.1986) (offender's failure in treatment), *review denied,* (Minn. Feb. 13, 1987). Satisfactory progress in treatment by a certain date can be made an explicit condition of probation. *See State v. Sejnoha,* 512 N.W.2d 597, 601 (Minn.App. 1994) (defendant's progress in treatment program must be assessed before release from probationary jail term), *review denied* (Minn. Apr. 22, 1994).

The record establishes that, if not certified, D.T.H. would be accepted into a high-securi-

ty juvenile facility and that five years will be an adequate time within which to determine whether it would be safe to return him to the community. Dr. Reidel, the psychologist who evaluated D.T.H., conceded that such a plan would adequately protect public safety.

Although D.T.H. was not diagnosed with any treatable disorder, his compliance with juvenile programming can certainly be measured in the future, and he should not be punished, in effect, for the fact that he has not been diagnosed as suffering from a psychosis. It seems clear that the capacity of this juvenile for a non-violent adaptation to the community can be far better assessed after five years of intensive programming than it can now after a single violent episode (this is a youth without a history of cruelty) and a brief course of psychological interviews.

Moreover, the interviews here—conducted in anticipation of a certification hearing—have little value, for the interviewers confronted—and lamentably failed to break through—a wall of defensive self-denial. That same self-denial seems a likely explanation for what the district court cited as an absence of remorse. In other words, the real child was not revealed in this certification proceeding.

In summary, I would reverse the trial court's certification order as an abuse of discretion. The *Dahl* requirement of non-offense-related evidence of dangerousness was not met and the alternative of EJJ programming—with a stringent condition of successful treatment by age 21—was not adequately considered.

All bridges have now been burned. This 15-year-old has, I expect, no way to avoid decades in prison. And the public authorities, too, with this certification, apparently take from themselves all alternatives to a murder conviction and sentence.