In the Matter of the WELFARE OF H.S.H., Child.

No. C0–99–1291.

Court of Appeals of Minnesota.

April 25, 2000.

Mike Hatch, Attorney General, St. Paul and Ross Arneson, Blue Earth County Attorney, Mark A. Lindahl, Assistant County Attorney, Mankato, for respondent county.

John M. Stuart, State Public Defender, Charlann Winking, Assistant State Public Defender, Minneapolis, for appellant.

Considered and decided by KLAPHAKE, Presiding Judge, CRIPPEN, Judge, and SHUMAKER, Judge.

## OPINION

KLAPHAKE, Judge.

H.S.H. appeals from a judgment certifying her as an adult in connection with several check forgery offenses she committed in October 1998, when she was 17 years old. She argues that the district court abused its discretion in certifying

her because the state failed to prove by clear and convincing evidence that retaining her in the juvenile system would not serve public safety, as required by Minn. Stat. § 260.125 (1998).

Because the state failed to establish that appellant is a present or future threat to public safety, we reverse the district court's certification decision.

### FACTS [1]

*Prior History*

Appellant has had extensive contact with the juvenile system that began when she was 12 and placed in St. Joseph's Home for Children, after she was found to be a child in need of protection and services. After she was discharged from that program due to inappropriate behavior and placed in another residential treatment center, she committed her first and, before the current offenses, her only other felony offense, aiding and abetting second-degree burglary.

Thereafter, appellant was asked to leave several shelters, group homes, and a foster care arrangement due to "inappropriate behavior." She committed several additional misdemeanor offenses, including disorderly conduct, criminal damage to property, and three fifth-degree assaults. In August 1995, appellant was placed at the Minnesota Correctional Facility in Sauk Centre, "due to her delinquent behavior and running away from numerous out-of-home placements."

Appellant was paroled in January 1996, but returned to Sauk Centre in February 1996, after she was charged with a second offense of disorderly conduct. Between August 1996 and March 1998, appellant violated parole several times; she was placed in detention centers, returned to Sauk Centre, and underwent inpatient chemical dependency treatment.

In early 1998, appellant learned she was pregnant. In a psychological assessment conducted at that time, she was diagnosed with conduct disorder and bipolar disorder. She was released from Sauk Centre in March 1998 and placed on parole.

*Current Offenses*

Between October 5 and 8, 1998, appellant deposited three checks totaling $10,500 into her credit union savings account. The checks, for $5,000, $3,500, and $2,000, were drawn on a closed account owned by Jamieson Martinson.

Appellant then made several withdrawals totaling $6,500 from a second branch of the credit union. Each time, she went to a different teller, and none of the tellers apparently verified whether the checks drawn on Martinson's account had cleared before they allowed appellant to withdraw the funds in cash or cashier's checks.

On October 8, 1998, the president of the credit union contacted police after appellant withdrew $500 from her savings account and obtained five cashier's checks for $500 each. Appellant was arrested when she tried to cash one of the cashier's checks. She was later charged with eight felony counts of check forgery and theft.

*Behavior since Current Offenses*

Because appellant was on parole at the time of the current offenses, she was returned to Sauk Centre in early December 1998. On December 24, 1998, she was released with instructions to find employment and a place to live.

Since her release in December 1998, appellant has remained law abiding and followed the terms of her parole. At the time of the certification hearing in June 1999, she was working 40 hours per week at Rainbow Foods, renting an apartment from her mother, caring for her 11–month–old daughter, and attending modeling school. Appellant is now 18 years old.

1. For purposes of a certification hearing, the charges against the juvenile are presumed to be true. *In re J.L.B.*, 435 N.W.2d 595, 598 (Minn.App.1989), *review denied* (Minn. Mar. 17, 1989).

*Certification Hearing*

In her court-ordered certification study and testimony at the certification hearing, Kellie Ludescher, a Blue Earth County probation officer who interviewed appellant once for approximately two hours, recommended that appellant be certified as an adult primarily because appellant had exhausted all available options in the juvenile system and there was no programming currently available to her. Ludescher admittedly placed more weight on appellant's past behavior than on her present behavior and agreed that appellant had done well since her release from Sauk Centre in December 1998. Ludescher conceded that appellant is presently not a threat to public safety.

Tanya Boehler, a Nicollet County probation officer who has worked with appellant for five years, testified that although appellant has a long history of noncompliance, she is currently doing quite well. Boehler did not support certifying appellant as an adult and did not believe that she was a public safety risk.

Kellie Manderfeld, a Nicollet County adolescent case coordinator who has worked with appellant for almost three years, testified regarding appellant's progress during the six months prior to the hearing:

> [Appellant] is working steadily for the first time. She's being a very caring, competent, above competent mother to her young daughter. She reaches out for help when she needs it. She seeks advice in her decisions. She obtained her driver's license, * * * without really too much help from anybody else. [S]he's responsible with her bills as much as she can be on a limited income. She helps others without thinking twice about it.

Manderfeld believed that appellant's change in character was honest and sincere. Manderfeld explained that, unlike in the past, appellant has consistently demonstrated appropriate behaviors over the past six months. Manderfeld further testified:

> Since [appellant] learned that she was pregnant she started to make improvements in her life and improve her decision making. I would say that there was a short period of time in the fall where she started to kind of fall off a little bit from frustration. [B]ut since returning from Sauk Centre in December and kind of getting that wake-up call, there's been no turning back, she's just been headed up.

Boehler testified that she did not believe that certification was appropriate or that appellant was a threat to public safety.

## ISSUE

Did the trial court abuse its discretion by concluding that the state had proven by clear and convincing evidence that public safety would not be served by retaining appellant in the juvenile system?

## ANALYSIS

■ A district court's decision to certify a juvenile for adult prosecution is entitled to "considerable latitude." *In re Welfare of J.L.B.*, 435 N.W.2d 595, 598 (Minn. App.1989), *review denied* (Minn. Mar. 17, 1989). This court will not reverse a juvenile certification order unless the district court's findings are "clearly erroneous so as to constitute an abuse of discretion." *In re Welfare of S.J.G.*, 547 N.W.2d 456, 459 (Minn.App.1996), *review denied* (Minn. Aug. 6, 1996).

This is a nonpresumptive certification case because, although appellant was nearly 18 at the time of the felony-level offenses, those offenses would not result in a presumptive commitment to prison under the sentencing guidelines. *See* Minn.Stat. § 260.125, subd. 2a. In a nonpresumptive case, the court may order certification only if the state proves "by clear and convincing evidence that retaining the proceeding in the juvenile court does not serve public safety." Minn.Stat. § 260.125, subd. 2(6)(ii); *see also In re Welfare of D.M.D.*, 607 N.W.2d 432, 438 (Minn.2000) (in non-

presumptive certification cases, prosecutor must prove public safety "will be served by either certifying a juvenile to adult court or by granting an EJJ designation").

In determining whether public safety is served, courts are directed to consider the following statutory factors:

(1) the seriousness of the alleged offense in terms of community protection, including the existence of any aggravating factors recognized by the sentencing guidelines, the use of a firearm, and the impact on any victim;

(2) the culpability of the child in committing the alleged offense, including the level of the child's participation in planning and carrying out the offense and the existence of any mitigating factors recognized by the sentencing guidelines;

(3) the child's prior record of delinquency;

(4) the child's programming history, including the child's past willingness to participate meaningfully in available programming;

(5) the adequacy of the punishment or programming available in the juvenile justice system; and

(6) the dispositional options available for the child.

Minn.Stat. § 260.125, subd. 2b. The statute further directs the court to give "greater weight" to factors (1) and (3), the seriousness of the offense and the child's prior record of delinquency. *Id.*

■ These factors, which address the nature of the offense and the circumstances of the child, are intended to assess whether a juvenile presents a risk to public safety and thus aim to predict whether a juvenile is likely to offend in the future. Although some of the factors examine the juvenile's past behavior and programming failures, others must be read to allow consideration of the juvenile's current conduct. In the end, the factors must show that a risk to public safety exists because the juvenile's behaviors are likely to continue.

*Seriousness of Offense and Culpability of Juvenile*

The district court found that appellant's commission of several felony-level offenses over a three-day period required some degree of sophistication and planning; the court further found that appellant admitted her culpability in carrying out these offenses. The court failed, however, to explain how these factors supported certification in terms of community protection.

Certification cases generally involve violent crimes against persons, such as murder or assault. *See, e.g., In re Welfare of D.T.H.*, 572 N.W.2d 742 (Minn.App.1997) (juvenile certified on first-and second-degree murder charges), *review denied* (Minn. Feb. 19, 1988). The risk to public safety in these types of cases is clear. Few cases have reported certification based on a property offense. *See, e.g., In re Welfare of C.L.S.*, 558 N.W.2d 12, 15–16 (Minn.App.1997) (juvenile certified on third-degree burglary charge), *rev'd on other grounds by D.M.D.*, 607 N.W.2d at 438; *In re Welfare of K.J.K.*, 357 N.W.2d 117, 118 (Minn.App.1984) (juvenile certified on unauthorized use of motor vehicle charge). In both of these cases, the juveniles showed patterns of escalating offenses, and the state presented evidence in the form of expert opinions from which it could be inferred that these behaviors were likely to continue. Here, none of the experts could testify that appellant is likely to continue with criminal activity or that she presents a current threat to public safety.

*Prior Record of Delinquency*

■ The district court found that appellant has an extensive prior record of delinquency. Again, the court failed to address how this prior record presents a threat to public safety. Appellant committed her only other felony, aiding and abetting second-degree burglary, six years ago, when she was 12. And prior to the current offenses, her most recent offense, disor-

derly conduct, occurred in early 1996 when she was 15 years old. Appellant's prior history fails to show deeply ingrained, escalating criminal behavior that presents a threat to public safety.

### Prior Programming

The district court found that appellant has an extensive history of noncompliance and failures at numerous types of juvenile treatment and dispositional programs. But even the district court recognized that she has been doing exceptionally well since she was released from Sauk Centre in December 1998. Again, this factor fails to support the conclusion that appellant is a present or future threat to public safety.

### Adequacy of Programming and Dispositional Options

In some cases, a strong need for treatment that is not available or would require more time to complete than that remaining under juvenile jurisdiction may weigh in favor of certification. Here, the state presented no evidence that appellant currently needs any type of out-of-home placement or that she requires anything other than supervised probation to protect the public, an alternative that can be provided in the juvenile system. To the contrary, the evidence demonstrates that appellant has been restored to law-abiding conduct.

Thus, all the evidence regarding appellant's current behavior and the recommendations of those professionals who have known her and worked with her for a number of years show that she is not a threat to public safety. Had the state presented evidence in the form of current psychological data to suggest that appellant's behaviors are likely to escalate and that she needs additional treatment that cannot be provided by the juvenile system, the state could have met its burden by clear and convincing evidence. *Cf. D.M.D.*, 607 N.W.2d at 438 (EJJ designation supported by opinions of state's experts); *In re Welfare of R.D.W.*, 407 N.W.2d 113, 116–17 (Minn.App.1987) (under prior law, which allowed certification if juvenile unsuitable for treatment or threat to public safety, determination must be based on psychological data or history of misconduct, as well as juvenile's age, level of maturity, and seriousness of offense), *review denied* (Minn. July 15, 1987). Because insufficient evidence was presented to support the conclusion that retaining appellant in the juvenile system does not serve public safety, we reverse the district court's certification order.

### DECISION

The district court's certification order is reversed.

**Reversed.**