*This opinion is nonprecedential except as provided by Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A23-0514**

In the Matter of the Welfare of: P. J. B., Child.

**Filed December 26, 2023
Affirmed; motion denied
Bratvold, Judge**

Dakota County District Court
File No. 19HA-JV-22-710

Christina Zauhar, Marsh Halberg, Halberg Criminal Defense, Bloomington, Minnesota (for appellant P.J.B.)

Keith Ellison, Attorney General, St. Paul, Minnesota; and

Kathryn M. Keena, Dakota County Attorney, Heather Pipenhagen, Assistant County Attorney, Hastings, Minnesota (for respondent State of Minnesota)

Considered and decided by Bratvold, Presiding Judge; Ross, Judge; and Schmidt, Judge.

**NONPRECEDENTIAL OPINION**

**BRATVOLD**, Judge

In this appeal from the district court's order certifying appellant for adult prosecution, appellant argues that the district court abused its discretion by determining that the statutory public-safety factors weighed in favor of adult certification. Appellant challenges the district court's findings on three of the six public-safety factors. Because the district court's findings were not clearly erroneous and because the district court did not abuse its discretion by certifying appellant for adult prosecution, we affirm.

# FACTS

On July 21, 2022, respondent State of Minnesota filed a juvenile-delinquency petition, charging appellant P.J.B. with third-degree murder under Minn. Stat. § 609.195(b) (2020). The state also moved to certify P.J.B. for prosecution as an adult, asserting that a presumption of certification applied. P.J.B. was 17 years and nine months old at the time of the alleged offense. If convicted of third-degree murder as an adult, P.J.B. would face a presumptive commitment to prison of 74 to 103 months.

## A.     The Offense

The following facts summarize the juvenile-delinquency petition and are presumed true for the purposes of certification. At 12:48 a.m. on April 20, 2022, police were dispatched to a West St. Paul home on a report that 15-year-old A.S. was "unconscious and not breathing." A small blue pill with an "M" on it was found in A.S.'s bedroom next to her body. Police also found an identical pill in the living room. A.S. was transported to a hospital and was pronounced dead shortly after arriving.

An autopsy determined that the cause of A.S.'s death was "Fentanyl Toxicity." The county drug task force identified the two pills found in A.S.'s home as oxycodone hydrochloride, 30 mg. The Bureau of Criminal Apprehension tested the pills and found that they contained fentanyl.

The state's investigation of A.S.'s death rested on evidence from A.S.'s phone including Snapchat messages, text messages, social-media photos, browser searches, and location data. A.S. communicated with P.J.B. on April 16, 2022, asking P.J.B., "do you come to west st. paul." The next day, P.J.B. replied, "yes watcha need."

On April 19, P.J.B. and A.S. discussed a meet-up time and each sent two photos of themselves. A.S. asked what pills P.J.B. had, and P.J.B. responded, "I got perks right now" for "$15 a pop." After negotiating price and the number of pills A.S. was willing to purchase, A.S. agreed to purchase four pills. They arranged to meet at a specific address on Robert Street in West St. Paul, and P.J.B. notified A.S. when he was 15 minutes away. At 9:07 p.m., P.J.B. messaged, "pulling up," and A.S. stated that she was "in front" and then messaged, "thanks bro next time I'll buy more."

At 9:50 p.m., P.J.B. messaged A.S., "only take like less than a quarter of it." At 2:03 a.m. on April 20, P.J.B. asked A.S., "they hitting?" A.S. did not respond.

A.S. also text-messaged her girlfriend on April 19. A.S. told her girlfriend that she took money from her sister to buy oxycodone and that her sister discovered her money was missing. A.S. stated that she did not take all the oxycodone and that she "flushed them." Two hours later, at 9:31 p.m., A.S. texted her girlfriend, "I'm scared," "Something happened again," and "I found percs in my room." A.S. stated, "I feel I wanna snort per[c]s," and "there's four." Her girlfriend responded to flush them, and A.S. assured her that she would. At 9:48 p.m., A.S. text-messaged her girlfriend, "I'm scared." Her girlfriend sent subsequent messages; A.S. did not respond.

A.S.'s photographs in social-media memories from April 19 between 9:12 and 9:38 p.m. included the following images: a hand holding blue pills; four blue pills, each marked with an "M," resting on top of what appears to be a blanket; four blue pills lined up on a makeup case; and four lines of powder on a makeup case. A.S. also sent her girlfriend a photo of blue pills.

A.S. entered the following searches on Google on April 19: "what pill is blue and has a m30 on it," "walgreens near me," "percs," "what happens when you snort percs," "what d[o]es it feel like to be on perca," "perc eyes," "how many percs is too many," "how much Percocet is OK," and "how do you snort powder."

Finally, location data obtained from A.S.'s phone confirmed that on April 19, A.S. left her home around 8:22 p.m. and traveled to Robert Street. A.S. left Robert Street around 9:11 p.m. and arrived home around 9:16 p.m. P.J.B.'s location data from his phone showed he was on Robert Street during the same time period.

**B.      District Court Proceedings**

In July 2022, after a hearing, the district court issued an order in which it found that probable cause supported the third-degree murder charge and that this case was "a presumptive certification matter." The district court also ordered Dakota County Community Corrections (DCCC) and an expert to complete certification studies.

P.J.B. waived the 90-day timeline for certification. Jaimee Bellfield, on behalf of DCCC, completed a certification study of P.J.B. dated September 29. The study recommended that the district court retain jurisdiction for extended-juvenile-jurisdiction (EJJ) proceedings rather than certify P.J.B. for adult prosecution. On October 10, the expert, psychologist Dr. Tricia Aiken, submitted a certification study of P.J.B. that also recommended an EJJ designation. That same day, the district court held the first of three days of an evidentiary hearing. Bellfield testified about the certification study, among other things.

4

On October 12, the state moved for the district court to direct Bellfield and Aiken to "prepare an addendum" to their certification studies and "re-evaluate" the third statutory public-safety factor "to include consideration of [P.J.B.'s] pending petitions" in Washington and Hennepin Counties. Both petitions were filed before P.J.B.'s third-degree-murder petition but stemmed from incidents occurring after A.S.'s death. The Washington County petition charged P.J.B. with one count of domestic assault by strangulation under Minn. Stat. § 609.2247, subd. 2 (2020), and one count of second-degree assault with a dangerous weapon under Minn. Stat. § 609.222, subd. 1 (2020). The Hennepin County petition charged P.J.B. with being an ineligible person in possession of a firearm or ammunition under Minn. Stat. § 624.713, subds. 1(1), 2(a) (2020). P.J.B. opposed the state's motion.

After a hearing, the district court ordered that Bellfield and Aiken "shall file an addendum" that either considered P.J.B.'s pending petitions or confirmed that they had already considered the petitions in the certification study. Aiken submitted a letter stating that she "did consider" P.J.B.'s pending petitions and did not "have anything else to add or change regarding [her] opinion and recommendations." Bellfield submitted an addendum stating that "in light of the seriousness of the pending charges" against P.J.B., DCCC's recommendation changed to "certification to adult court rather than [EJJ] as previously recommended."

In November 2022, the district court continued the evidentiary hearing on certification. P.J.B. called the following witnesses: Bellfield; Aiken; Adam Blaschko, a

5

program director for the Minnesota Department of Corrections in Red Wing; and P.J.B.'s father. The state called no witnesses.

On March 30, 2023, the district court issued its findings of fact, conclusions of law, and order granting certification. The district court determined that five of the six public-safety factors favored certifying P.J.B. for adult prosecution. Specifically, the following factors favored certification: the seriousness of the offense, P.J.B.'s culpability in committing the offense, P.J.B.'s prior record of delinquency, the adequacy of the punishment or programming available in the juvenile-justice system, and the dispositional options available. One public-safety factor—P.J.B.'s programming history—supported EJJ. The district court concluded that P.J.B. failed to "rebut[] the presumption [of certification] by clear and convincing evidence demonstrating that retaining the proceeding in juvenile court serves public safety" and that "[p]ublic safety is best served by certifying [P.J.B.] to Adult Court." The district court terminated juvenile jurisdiction and certified P.J.B. for adult prosecution.

P.J.B. appeals. The district court granted P.J.B.'s motion to stay the criminal proceedings pending appeal.

**DECISION**

P.J.B. argues that the "district court abused its discretion when it determined the risk to public safety favored adult certification." Generally, the juvenile division of the district court "has original and exclusive jurisdiction in proceedings concerning" a juvenile under 18 years of age who is accused of a crime. Minn. Stat. § 260B.101, subd. 1 (2022). But when a juvenile is over 14 years old and is alleged to have committed an "offense that

6

would be a felony if committed by an adult," the district court may certify the juvenile for prosecution as an adult. Minn. Stat. § 260B.125, subd. 1 (2022).

A presumption of adult certification applies if the juvenile "was 16 or 17 years old at the time of the offense" and the alleged offense "would result in a presumptive commitment to prison" for an adult. *Id.*, subd. 3 (2022). If the presumption applies, the juvenile has the burden "to rebut this presumption by demonstrating by clear and convincing evidence that retaining the proceeding in the juvenile court serves public safety." *Id.* If the district court determines that the juvenile fails to rebut the presumption, "the court shall certify the proceeding." *Id.* Here, the district court determined that this was a presumptive-certification case and P.J.B. therefore had the burden to prove that retaining juvenile jurisdiction over him would serve public safety.

The district court must consider six factors in determining whether adult certification serves public safety:

> (1) the seriousness of the alleged offense in terms of community protection, including the existence of any aggravating factors recognized by the Sentencing Guidelines, the use of a firearm, and the impact on any victim;
> (2) the culpability of the child in committing the alleged offense, including the level of the child's participation in planning and carrying out the offense and the existence of any mitigating factors recognized by the Sentencing Guidelines;
> (3) the child's prior record of delinquency;
> (4) the child's programming history, including the child's past willingness to participate meaningfully in available programming;
> (5) the adequacy of the punishment or programming available in the juvenile justice system; and
> (6) the dispositional options available for the child.

7

*Id.*, subd. 4 (2022). The district court must "give greater weight" to the first and third factors. *Id.* "For purposes of a certification determination, the charges against the child and the factual allegations of the petition are presumed true." *In re Welfare of J.H.*, 844 N.W.2d 28, 38 (Minn. 2014).

"A district court has considerable latitude in deciding whether to certify a case for adult prosecution." *In re Welfare of P.C.T.*, 823 N.W.2d 676, 681 (Minn. App. 2012) (quotation omitted). Appellate courts review a certification decision for an abuse of discretion. *See In re Welfare of H.B.*, 986 N.W.2d 158, 166 (Minn. 2022) (reviewing an order denying certification). Appellate courts will "not disturb a finding that public safety would be served by certification unless it is clearly erroneous." *In re Welfare of N.J.S.*, 753 N.W.2d 704, 710 (Minn. 2008). Under the clear-error standard, an appellate court may not reweigh the evidence, reconcile conflicting evidence, or engage in fact-finding anew. *In re Civ. Commitment of Kenney*, 963 N.W.2d 214, 221-22 (Minn. 2021). Rather, an appellate court undertakes a "review of the record to confirm that evidence exists to support the decision." *Id.* at 222. A finding of fact "is clearly erroneous only if there is no reasonable evidence to support the finding or when an appellate court is left with the definite and firm conviction that a mistake occurred." *H.B.*, 986 N.W.2d at 166 (quotation omitted).

Before considering P.J.B.'s arguments, we summarize the district court's findings on factors one, two, and four. The district court found that factor one—"the seriousness of the alleged offense"—favored certification. Minn. Stat. § 260B.125, subd. 4(1). The district court stated that the offense, third-degree murder, was "very serious" and "would

8

carry a presumptive commitment . . . of 74-103 months" in prison. The district court noted that there was no evidence "of any aggravating factors recognized by the Minnesota Sentencing Guidelines" and that A.S.'s family provided victim-impact statements that "emphasized how their lives have been deeply impacted due to A.S.'s untimely death."

Under factor two, the district court considered P.J.B.'s "culpability . . . in committing the alleged offense" and found that this factor favored certification. *Id.*, subd. 4(2). The district court found that P.J.B. "was responsible for his own actions in this offense," that there were "no mitigating factors such as coercion, duress or any cognitive ability issues that would reduce his culpability," and that P.J.B. "was the sole participant in selling [A.S.] a drug containing Fentanyl." The district court also found that P.J.B. "had knowledge that the drugs he sold [A.S.] were dangerous, which is evident by his warning to her to only take a quarter of the pill."

Factor four requires the district court to consider "the child's programming history, including the child's past willingness to participate meaningfully in available programming." *Id.*, subd. 4(4). In doing so, the district court found that this factor favored EJJ. The district court found that "[t]here has been no formal programming history until [P.J.B.'s] placement in the juvenile detention centers." The district court stated that P.J.B. "has been participating in programming and has had some challenges with behaviors, although he has been following directions and assisting peers," and the district court found that P.J.B.'s behavior has improved since his initial placement in juvenile detention.

We next consider P.J.B.'s challenges to public-safety factors three, five, and six.

## A.      Factor Three: Juvenile's Prior Record of Delinquency

Under factor three, the district court must consider the juvenile's prior record of delinquency. Minn. Stat. § 260B.125, subd. 4(3). At the time of the certification trial, P.J.B. had three prior adjudications for traffic offenses and two pending petitions in Washington and Hennepin Counties. We begin by briefly discussing the incidents as described in the pending petitions, all of which occurred after A.S.'s death.

In Washington County on May 17, 2022, P.J.B. pointed a loaded gun at his girlfriend. P.J.B.'s girlfriend also told police that on May 24, P.J.B. strangled her, and at the time, P.J.B. possessed a gun but did not use it. The state filed a delinquency petition charging P.J.B. with one count of second-degree assault with a dangerous weapon and one count of domestic assault by strangulation.

In Hennepin County, police conducted a May 26 traffic stop of P.J.B.'s vehicle, apparently based on a Washington County arrest warrant for the above incidents. In a search incident to arrest, police found a pistol in P.J.B.'s front waistband, along with a handgun magazine containing ammunition and a vape inside a crossbody bag that P.J.B. was wearing. Inside P.J.B.'s vehicle, police found a handgun holster, two empty shell casings, seven boxes of ammunition, multiple small blue pills with an "M" that were identified as oxycodone hydrochloride 30 mg and 5 mg, Alprazolam, and four cell phones. The state petitioned for delinquency with a charge of ineligible possession of a firearm or ammunition.

Based on the pending petitions in Washington and Hennepin Counties, the district court found that P.J.B.'s prior record of delinquency supported adult certification. In his

brief to this court, P.J.B. argues that district court erred by (1) ordering Bellfield "to violate [DCCC] policy for certification evaluations" and "consider pending matters" and (2) determining that P.J.B. demonstrated an "escalating pattern of violent and criminal behavior." We consider these arguments in turn.[1]

### 1. The District Court's Order to DCCC Requiring Consideration of P.J.B.'s Pending Petitions

P.J.B. first argues that the district court should have "permitted DCCC to follow its standard practice" of excluding pending petitions from P.J.B.'s certification study. At trial, Bellfield testified that it "has been the practice of Dakota County corrections" to "not consider pending cases." Bellfield added that "once [DCCC] had to consider [P.J.B.'s] pending charges and the seriousness of those charges," DCCC changed its recommendation to adult certification.

In his brief to this court, P.J.B. does not dispute that a district court may consider pending petitions as part of a juvenile's prior record of delinquency. Indeed, the supreme court has stated that under factor three, "'prior record of delinquency' unambiguously refers to records of petitions to juvenile court and the adjudication of alleged violations of the law by minors." *N.J.S.*, 753 N.W.2d at 710. P.J.B. contends, however, that this court has held only that "pending charges are relevant to the conclusions in the *psychological*

---

[1] P.J.B. raises a third argument in his reply brief, arguing for the first time on appeal that neither of his pending offenses "occurred prior to the allegations in the present case, and thus [they] should not be considered in determining P.J.B.'s prior record of delinquency." P.J.B. did not make this argument in district court or in his initial brief to this court. Thus, we conclude that this argument "was impermissibly raised for the first time in the reply brief and is not properly before the court," and we decline to consider it. *State v. King*, 990 N.W.2d 406, 415 n.4 (Minn. 2023).

*evaluation*," and thus, the district court erred in ordering DCCC to consider pending petitions. *In re Welfare of K.A.P.*, 550 N.W.2d 9, 12 (Minn. App. 1996) (emphasis added), *rev. denied* (Minn. Aug. 20, 1996). The state argues that this court in *K.A.P.* did not determine that "the facts of the pending offenses are limited" to the conclusions in a psychological evaluation.

Three cases provide helpful guidance regarding the consideration of pending juvenile petitions. First, in *K.A.P.*, the appellant challenged the district court's decision that he failed to rebut the presumption of certification for a second-degree-murder charge. *Id.* at 10-11. The appellant had "no prior juvenile adjudications" and "two fifth-degree assault petitions pending." *Id.* at 10. The district court acknowledged that in ordering adult certification, it relied in part on the two pending assault petitions "because that conduct showed a pattern." *Id.* at 12. This court affirmed adult certification and concluded that "to require the trial court to ignore the two pending assault charges would unduly limit the court's ability to accurately assess the risk to public safety" and that "[a]t the least, the pending charges are relevant to the conclusions in the psychological evaluation." *Id.*

Second, *In re Welfare of D.T.H.* involved a non-presumptive certification for first- and second-degree-murder charges. 572 N.W.2d 742, 742, 744 (Minn. App. 1997), *rev. denied* (Minn. Feb. 19, 1998). This court affirmed the district court's certification order. *Id.* at 746. After reviewing the appellant's prior record of delinquency, this court noted that his record included "a gross misdemeanor for crimes to another, criminal damage to property, grand theft auto, as well as a pending burglary charge for breaking into the vacant

mobile home." *Id.* at 745. This court reasoned that "considering the timing of these offenses, [the appellant's] criminal conduct has escalated greatly in the past year." *Id.*

Third, *In re Welfare of R.D.M., III* also provides guidance. 825 N.W.2d 394 (Minn. App. 2013), *rev. denied* (Minn. Apr. 16, 2013). *R.D.M.* did not involve a presumption of adult certification. *Id.* at 399. The district court determined that the appellant's prior record of delinquency supported certification based on his two convictions for felony assault, his recent admissions to four similar felonies in another county, and his related charges pending in North Dakota. *Id.* at 400. This court affirmed, noting that the district "court is authorized to consider pending charges" and that when the appellant's prior adjudications "are considered along with his pending charges, they clearly show escalating criminal behavior that presents a threat to public safety." *Id.* at 400-01.

We conclude that the district court did not err in ordering DCCC to consider P.J.B.'s pending petitions. P.J.B. improperly narrows this court's decision in *K.A.P.* by implying that pending petitions are to be considered only in a juvenile's psychological evaluation. But in *K.A.P.*, we stated that pending petitions are "*[a]t the least . . .* relevant to the conclusions in the psychological evaluation." 550 N.W.2d at 12 (emphasis added). Thus, *K.A.P.* identified one circumstance in which a pending delinquency petition is a relevant consideration but did not limit the district court's consideration of a pending petition to that circumstance. *See The American Heritage Dictionary of the English Language* 1000 (5th ed. 2018) (defining "at least" as "not less than"). Further, *D.T.H.* and *R.D.M.* were decided after *K.A.P.* and do not confine the consideration of pending petitions to psychological evaluations.

13

P.J.B. also contends that the district court's certification order "did not even mention DCCC's initial certification evaluation" or that the court "forced" DCCC to consider P.J.B.'s pending petitions. It is true that the district court's certification order did not state that it required DCCC to consider P.J.B.'s pending petitions. The district court's certification order acknowledged, however, that DCCC "initially only considered [P.J.B.'s] prior three traffic related offenses and did not consider [P.J.B.'s] pending felony cases." And the district court record is clear, as summarized above, that the district court directed DCCC to file an addendum that either considered P.J.B.'s pending petitions or explained that it had already considered the pending petitions. Bellfield testified that DCCC had not previously considered P.J.B.'s pending petitions, so it proceeded to do so after the district court's order.

We conclude that the district court did not err by ordering DCCC to consider P.J.B.'s pending petitions as part of his prior record of delinquency.

### 2. The District Court's Determination That P.J.B. Displayed a Pattern of Escalating Criminal Behavior

P.J.B. argues that the district court erred in considering P.J.B.'s pending offenses because this court has "considered unadjudicated conduct only when the conduct reflected a pattern," and caselaw and Aiken's testimony show "that the other two pending charges did not reflect a pattern." The state argues that "this court did not limit" district courts' review of pending petitions "to *only* a consideration of a pattern of conduct," but regardless, P.J.B.'s conduct "constitutes a pattern." The state also argues that "it was not clear error"

14

for the district court to agree with DCCC's recommendation that factor three supported certification and disagree with Aiken's contrary recommendation.

In considering P.J.B.'s prior record of delinquency, the district court analyzed whether P.J.B. showed "escalating criminal behavior that presents a threat to public safety," citing *In re Welfare of H.S.H.*, 609 N.W.2d 259, 263 (Minn. App. 2000). The district court was "not persuaded by Dr. Aiken's testimony that [P.J.B.'s] three most recent offenses constitute a 'cluster offense'" and thus "should be considered as one large offense in terms of the risk for public safety." Rather, the district court determined that P.J.B.'s offenses "were one month apart" and "display an escalating pattern" of behavior "involving firearms and violence towards others." The district court was "most concern[ed]" that P.J.B. "continued to be in the possession of a quantity of the same, or similar, pills after A.S.'s death." The district court concluded that P.J.B.'s pending petitions were "very serious in nature and pose[d] a potential threat to public safety" and therefore favored adult certification.

We first note that caselaw does not limit a district court's consideration of pending petitions to conduct that shows a "pattern." *K.A.P.*, 550 N.W.2d at 12. P.J.B. argues that pending charges should be used to demonstrate the juvenile's prior record of delinquency *if* "the conduct show[s] a pattern." *Id.* But this court in *K.A.P.* merely observed that the district court relied on the appellant's pending petitions in ordering adult certification "because that conduct showed a pattern." *Id.*

Next, we conclude that the record supports the district court's determination that P.J.B.'s pending petitions displayed "an escalating pattern of violent and criminal

15

behavior." In P.J.B.'s pending petitions, "he was either found with, captured on video possessing, or was witnessed with a gun," and in two of the underlying incidents, P.J.B. "either threatened someone with the gun or had it on his person during the commission of an alleged act of violence." Bellfield testified that in both of P.J.B.'s pending petitions, DCCC was concerned about "him being in possession of a weapon and how he used these weapons and ultimately that he was charged for having a weapon." In addition, one of P.J.B.'s pending petitions alleged that police found oxycodone pills, among other things, in P.J.B.'s vehicle. Bellfield testified that this pending petition demonstrated P.J.B. was a public safety concern because P.J.B. might "continue to sell those pills that were in his possession."

P.J.B. argues that the district court erred by "[i]gnoring" Aiken's testimony that P.J.B.'s pending petitions should be considered a "cluster offense," meaning "one big offense" from a "risk perspective." But P.J.B. fails to consider the district court's statement that it was "not persuaded by Dr. Aiken's testimony that [P.J.B.'s] three most recent offenses constitute a 'cluster offense.'" "The weight and credibility to be given to the opinion of an expert lies with the factfinder." *State ex rel. Trimble v. Hedman*, 192 N.W.2d 432, 440 (Minn. 1971). In reviewing the district court's findings for clear error, this court will not reconcile conflicting evidence or reweigh it. *Kenney*, 963 N.W.2d at 221-22. Because the district court found Aiken's testimony not persuasive, we conclude that record supports the district court's finding that P.J.B.'s pending petitions displayed "escalating and violent behavior."

16

To summarize our analysis of this factor, the district court did not err by ordering DCCC to consider P.J.B.'s pending petitions and determining that P.J.B.'s prior record of delinquency posed "a potential threat to public safety" and that factor three therefore supported adult certification.

**B.      Factors Five and Six: Adequacy of the Punishment or Programming in the Juvenile System and Dispositional Options**

Under factor five, the district court considers "the adequacy of the punishment or programming available in the juvenile justice system." Minn. Stat. § 260B.125, subd. 4(5). And under factor six, the district court considers "the dispositional options available" for the juvenile. *Id.*, subd. 4(6). Appellate courts may consider factors five and six together. *See N.J.S.*, 753 N.W.2d at 711; *D.T.H.*, 572 N.W.2d at 745.

The district court found that factors five and six favored adult certification. The district court considered P.J.B.'s amenability to treatment, the adequacy of available programming, the length of potential sentences, and whether the sentences would sufficiently address the seriousness of the offense or ensure public safety. The district court concluded that P.J.B. "failed to clearly and convincingly show that [he] would be amenable to treatment and that adequate programming is available under the juvenile justice system with less than 28 months left until he turns 21 years old." The district court also expressed concern as to "whether this period of time [was] sufficient for programming to have a meaningful effect on rehabilitating" P.J.B. and about "the inadequacy of this punishment [in the juvenile system] in light of the gravity of the offense."

17

P.J.B. argues that the district court erred by finding that these factors favored adult certification. P.J.B. first contends that both Aiken and DCCC found there was "an adequate amount of time for [P.J.B.] to complete programming" in the juvenile system.

We begin by summarizing the relevant record. Aiken's certification study, completed in October 2022, stated that "the two years, nine months left under an EJJ designation are enough to provide [P.J.B.] with the necessary supervision and intervention to manage his risk to the public." Similarly, DCCC's certification study from September 2022 stated that the "approximately thirty-four (34) months" remaining until P.J.B.'s twenty-first birthday "provide[] adequate time for [P.J.B.] to complete programming in the juvenile system and . . . for the provision of accountability measures." The district court's certification order noted that DCCC "agreed [with Aiken] that there is adequate time for programming in the juvenile system."

But Aiken's and DCCC's determinations regarding the adequacy of programming do not show that the district court clearly erred regarding its findings on factors five and six. We note that when the district court issued its certification order, the available time for P.J.B. to complete programming in the juvenile system had diminished to "less than 28 months"—as compared to the approximately 34 months remaining at the time of Aiken's and DCCC's certification studies.

In addition, factor five also allows the district court to consider the adequacy of punishment in the juvenile-justice system. Minn. Stat. § 260B.125, subd. 4(5). Here, the district court determined that "the inadequacy" of punishment in the juvenile system favored adult certification. The district court found that DCCC was "uncertain as to

18

whether" the time remaining before P.J.B.'s twenty-first birthday would provide "adequate . . . punishment for loss of life." This finding is supported by Bellfield's trial testimony, in which she stated that DCCC "didn't necessarily all agree on" whether "34 months [was] an adequate amount of time for punishment within the juvenile system." Thus, the record supports the district court's findings regarding the insufficient amount of time for programming and the inadequacy of punishment in the juvenile system.

P.J.B. argues second that the district court clearly erred by finding that factors five and six favored certification because Blaschko "offered great detail" about the cognitive-restructuring (COG) program at Red Wing, which "would allow [P.J.B.] to address his chemical dependency issues and receive the individual therapy he needs."

The district court found that Blaschko, Bellfield, and Aiken were "unable to provide specifics about program structure, metrics for measuring progress in programming, transition plans, if any, programming available, and/or length of the program, at the other possible placements mentioned as a potential option by Hennepin County."[2] The district court stated that Blaschko's testimony indicated P.J.B. "would *likely* be eligible to participate in the COG program" at Red Wing and that Bellfield and Aiken "were unable to provide an ultimate recommendation as to which program or facility would best meet [P.J.B.'s] individual needs." These findings are supported by the record.

---

[2] While P.J.B.'s petition for his third-degree murder charge is in Dakota County, the district court noted that P.J.B. "is a Hennepin County resident so any EJJ disposition of this matter would be transferred there."

Bellfield testified that as to the dispositional options, DCCC was "familiar with the placements" but could not "say exactly what the programming is within each placement" or the length of time necessary for rehabilitation in the program. Aiken testified that she was not "fully knowledgeable about all of the programs" and that she was not familiar with the factors used to determine a juvenile's amount of time in programming.

Blaschko testified that the average length of a juvenile's stay inside the Red Wing correctional facility in a loss-of-life case is 21 months but that the commissioner has sole authority to set the length of commitment. Blaschko also testified that he had not been contacted by probation about Red Wing being a placement option for P.J.B. and agreed that he did not know anything about P.J.B.'s charged offense or treatment needs.

Further, P.J.B.'s brief to this court concedes that Blaschko could not provide more specific program details because the Red Wing "facility had not received information on P.J.B." Thus, the district court did not clearly err by finding that P.J.B. did not "clearly and convincingly show" that adequate programming was available within the juvenile system. We therefore conclude that the district court did not err by determining that factors five and six supported adult certification.

In sum, the district court did not clearly err in its findings on the third, fifth, and sixth public-safety factors. Because five of the six factors support certification, including the two weighed most heavily, the district court did not abuse its discretion by granting the state's motion to certify P.J.B. for prosecution as an adult.

## C.    Motion to Strike

After the parties submitted their briefs and before oral argument, P.J.B. filed a letter giving notice of supplemental authority under Minn. R. Civ. App. P. 128.05. P.J.B. stated that the Hennepin County Attorney dismissed P.J.B.'s pending petition. P.J.B. attached the county's notice of dismissal. The state moved to strike P.J.B.'s letter and accompanying document, arguing that P.J.B. improperly submitted "factual information . . . which is not part of the district court record."

"The documents filed in the trial court, the exhibits, and the transcript of the proceedings, if any, shall constitute the record on appeal in all cases." Minn. R. Civ. App. P. 110.01. While this court has taken judicial notice of court records in other proceedings, P.J.B. does not ask us to do so here. *See, e.g.*, *Smisek v. Comm'r of Pub. Safety*, 400 N.W.2d 766, 768 (Minn. App. 1987) (taking judicial notice of a district court order in a related license-revocation proceeding). Moreover, the Hennepin County Attorney's dismissal of P.J.B.'s petition occurred *after* the district court's certification decision and thus was not considered by the district court. "[A]n appellate court may not base its decision on matters outside the record on appeal," and "matters not produced and received in evidence below may not be considered." *State v. Patzold*, 917 N.W.2d 798, 812 (Minn. App. 2018) (quotation omitted), *rev. denied* (Minn. Nov. 27, 2018). Accordingly, because our review considers only what is in the record on appeal, we do not consider P.J.B.'s letter or the attached document and therefore need not strike them.

**Affirmed; motion denied.**

21